(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LAWSON ET AL. *v.* FMR LLC ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 12–3.   Argued November 12, 2013—Decided March 4, 2014

To safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation, Congress passed the Sarbanes-Oxley Act of 2002.  One of the Act's provisions protects whistleblowers; at the time relevant here, that provision instructed: "No [public] company . . ., or any . . . contractor [or] subcontractor . . . of such company, may discharge, demote, suspend, threaten, harass, or . . . discriminate against an employee in the terms and conditions of employment because of [whistleblowing activity]." 18 U. S. C. §1514A(a).

Plaintiffs below, petitioners here, are former employees of respondents (collectively FMR), private companies that contract to advise or manage mutual funds.  As is common in the industry, the mutual funds served by FMR are public companies with no employees.  Both plaintiffs allege that they blew the whistle on putative fraud relating to the mutual funds and, as a consequence, suffered retaliation by FMR.  Each commenced suit in federal court.  Moving to dismiss the suits, FMR argued that the plaintiffs could state no claim under §1514A, for that provision protects only employees of public companies, and not employees of private companies that contract with public companies.  On interlocutory appeal from the District Court's denial of FMR's motion to dismiss, the First Circuit reversed, concluding that the term "an employee" in §1514A(a) refers only to employees of public companies.

*Held*: The judgment is reversed and the case is remanded.

670 F. 3d 61, reversed and remanded.

JUSTICE GINSBURG delivered the opinion of the Court, concluding that §1514A's whistleblower protection includes employees of a public

company's private contractors and subcontractors.  Pp. 9–29.

(a) This reading of §1514A is supported by the provision's text. Pp. 9–16.

(1) The Court looks first to the ordinary meaning of the provision's language.  See *Moskal* v. *United States*, 498 U. S. 103, 108.  As relevant here, §1514A(a) provides that "no . . . contractor . . . may discharge . . . an employee."  The ordinary meaning of "an employee" in this proscription is the contractor's own employee.  FMR's "narrower construction" requires inserting "of a public company" after "an employee," but where Congress meant "an employee of a public company," it said so.

The provision as a whole supports this reading.  The prohibited retaliatory measures enumerated in §1514A(a)—discharge, demotion, suspension, threats, harassment, or discrimination in employment terms and conditions—are actions an employer takes against its own employees.  Contractors are not ordinarily positioned to take adverse actions against employees of the public company with whom they contract.  FMR's interpretation of §1514A, therefore, would shrink to insignificance the provision's ban on retaliation by contractors.  The protected activity covered by §1514A, and the provision's enforcement procedures and remedies, also indicate that Congress presumed an employer-employee relationship between the retaliator and the whistleblowing employee.  Pp. 9–14.

(2) FMR's textual arguments are unpersuasive.  It urges that "an employee" must be read to refer exclusively to public company employees to avoid the absurd result of extending protection to the personal employees of company officers and employees, *e.g.,* their housekeepers or gardeners.  This concern appears more theoretical than real and, in any event, is outweighed by the compelling arguments opposing FMR's reading of §1514A.  FMR also urges that its reading is supported by the provision's statutory headings, but those headings are "not meant to take the place of the detailed provisions of the text."  *Trainmen* v. *Baltimore & Ohio R. Co.*, 331 U. S. 519, 528.  Pp. 14–16.

(b) Other considerations support the Court's textual analysis. Pp. 16–27.

(1) The Court's reading fits §1514A's aim to ward off another Enron debacle.  The legislative record shows Congress' understanding that outside professionals bear significant responsibility for reporting fraud by the public companies with whom they contract, and that fear of retaliation was the primary deterrent to such reporting by the employees of Enron's contractors.  Sarbanes-Oxley contains numerous provisions designed to control the conduct of accountants, auditors, and lawyers who work with public companies, but only §1514A

Syllabus

affords such employees protection from retaliation by their employers for complying with the Act's reporting requirements.  Pp. 16–20.

(2) This Court's reading of §1514A avoids insulating the entire mutual fund industry from §1514A.  Virtually all mutual funds are structured so that they have no employees of their own; they are managed, instead, by independent investment advisors.  Accordingly, the "narrower construction" endorsed by FMR would leave §1514A with no application to mutual funds.  The Court's reading of §1514A, in contrast, protects the employees of investment advisors, who are often the only firsthand witnesses to shareholder fraud involving mutual funds.  Pp. 20–22.

(3) There is scant evidence that today's decision will open any floodgates for whistleblowing suits outside §1514A's purposes.  The Department of Labor's regulations have interpreted §1514A as protecting contractor employees for almost a decade, yet FMR is unable to identify a single case in which the employee of a private contractor has asserted a §1514A claim based on allegations unrelated to shareholder fraud.  Plaintiffs and the Solicitor General suggest various limiting principles to dispel any overbreadth problems.  This Court need not determine §1514A's bounds here, however, because, if plaintiffs' allegations prove true, plaintiffs are precisely the "firsthand witnesses to [the shareholder] fraud" Congress anticipated §1514A would protect.  S. Rep. No. 107–146, p. 10.  Pp. 22–24.

(4) The 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act does not affect this Court's task of determining whether Congress in 2002 afforded protection to whistleblowing contractor employees.  Pp. 24–27.

(c) AIR 21's whistleblower protection provision has been read to cover, in addition to employees of air carriers, employees of contractors and subcontractors of the carriers.  Given the parallel statutory texts and whistleblower protective aims, the Court reads the words "an employee" in AIR 21 and in §1514A to have similar import.  Pp. 27–29.

JUSTICE SCALIA, joined by JUSTICE THOMAS, relying only on 18 U. S. C. §1514A's text and broader context, agreed that §1514A protects employees of private contractors from retaliation when they report covered forms of fraud.  Pp. 1–3.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER and KAGAN, JJ., joined, and in which SCALIA and THOMAS, JJ., joined in principal part.  SCALIA, J., filed an opinion concurring in principal part and concurring in the judgment, in which THOMAS, J., joined.  SOTOMAYOR, J., filed a dissenting opinion, in which KENNEDY and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 12–3

————

## JACKIE HOSANG LAWSON AND JONATHAN M. ZANG, PETITIONERS *v.* FMR LLC ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[March 4, 2014]

JUSTICE GINSBURG delivered the opinion of the Court.

To safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation, Congress enacted the Sarbanes-Oxley Act of 2002, 116 Stat. 745. See S. Rep. No. 107–146, pp. 2–11 (2002). A provision of the Act, 18 U. S. C. §1514A, protects whistleblowers. Section 1514A, at the time here relevant, instructed:

> "No [public] company . . . , or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of [whistleblowing or other protected activity]." §1514A(a) (2006 ed.).

This case concerns the definition of the protected class: Does §1514A shield only those employed by the public company itself, or does it shield as well employees of privately held contractors and subcontractors—for example, investment advisers, law firms, accounting enterprises—who perform work for the public company?

We hold, based on the text of §1514A, the mischief to which Congress was responding, and earlier legislation Congress drew upon, that the provision shelters employees of private contractors and subcontractors, just as it shelters employees of the public company served by the contractors and subcontractors. We first summarize our principal reasons, then describe this controversy and explain our decision more comprehensively.

Plaintiffs below, petitioners here, are former employees of private companies that contract to advise or manage mutual funds. The mutual funds themselves are public companies that have no employees. Hence, if the whistle is to be blown on fraud detrimental to mutual fund investors, the whistleblowing employee must be on another company's payroll, most likely, the payroll of the mutual fund's investment adviser or manager.

Taking the allegations of the complaint as true, both plaintiffs blew the whistle on putative fraud relating to the mutual funds and, as a consequence, suffered adverse action by their employers. Plaintiffs read §1514A to convey that "[n]o . . . contractor . . . may . . . discriminate against [its own] employee [for whistleblowing]." We find that reading consistent with the text of the statute and with common sense. Contractors are in control of their own employees, but are not ordinarily positioned to control someone else's workers. Moreover, we resist attributing to Congress a purpose to stop a contractor from retaliating against whistleblowers employed by the public company the contractor serves, while leaving the contractor free to retaliate against its own employees when they reveal corporate fraud.

In the Enron scandal that prompted the Sarbanes-Oxley Act, contractors and subcontractors, including the accounting firm Arthur Andersen, participated in Enron's fraud and its coverup. When employees of those contractors attempted to bring misconduct to light, they encoun-

tered retaliation by their employers. The Sarbanes-Oxley Act contains numerous provisions aimed at controlling the conduct of accountants, auditors, and lawyers who work with public companies. See, *e.g.,* 116 Stat. 750–765, 773–774, 784, §§101–107, 203–206, 307. Given Congress' concern about contractor conduct of the kind that contributed to Enron's collapse, we regard with suspicion construction of §1514A to protect whistleblowers only when they are employed by a public company, and not when they work for the public company's contractor.

Congress borrowed §1514A's prohibition against retaliation from the wording of the 2000 Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), 49 U. S. C. §42121. That Act provides: "No air carrier or contractor or subcontractor of an air carrier may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment" when the employee provides information regarding violations "relating to air carrier safety" to his or her employer or federal authorities. §42121(a)(1). AIR 21 has been read to cover, in addition to employees of air carriers, employees of contractors and subcontractors of the carriers. Given the parallel statutory texts and whistleblower protective aims, we read the words "an employee" in AIR 21 and in §1514A to have similar import.

I

A

The Sarbanes-Oxley Act of 2002 (Sarbanes-Oxley or Act) aims to "prevent and punish corporate and criminal fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions." S. Rep. No. 107–146, p. 2 (2002) (hereinafter

S. Rep.).[1] Of particular concern to Congress was abundant evidence that Enron had succeeded in perpetuating its massive shareholder fraud in large part due to a "corporate code of silence"; that code, Congress found, "discourage[d] employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally." *Id.,* at 4–5 (internal quotation marks omitted). When employees of Enron and its accounting firm, Arthur Andersen, attempted to report corporate misconduct, Congress learned, they faced retaliation, including discharge. As outside counsel advised company officials at the time, Enron's efforts to "quiet" whistleblowers generally were not proscribed under then-existing law. *Id.,* at 5, 10. Congress identified the lack of whistleblower protection as "a significant deficiency" in the law, for in complex securities fraud investigations, employees "are [often] the only firsthand witnesses to the fraud." *Id.,* at 10.

Section 806 of Sarbanes-Oxley addresses this concern. Titled "Protection for Employees of Publicly Traded Companies Who Provide Evidence of Fraud," §806 added a new provision to Title 18 of the United States Code, 18 U. S. C. §1514A, which reads in relevant part:

> "**Civil action to protect against retaliation in fraud cases**
> "(a) WHISTLEBLOWER PROTECTION FOR EMPLOYEES

_____

[1] Title VIII of the Act, which contains the whistleblower protection provision at issue in this case, was authored by Senators Leahy and Grassley and originally constituted a discrete bill, S. 2010. We thus look to the Senate Report for S. 2010, S. Rep. No. 107–146, as the Senate Report relevant here. See 148 Cong. Rec. S7418 (daily ed. July 26, 2002) (statement of Sen. Leahy) ("unanimous consent" to "includ[e] in the CONGRESSIONAL RECORD as part of the official legislative history" of Sarbanes-Oxley that Title VIII's "terms track almost exactly the provisions of S. 2010, introduced by Senator Leahy and reported unanimously from the Committee on the Judiciary").

OF PUBLICLY TRADED COMPANIES.—No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U. S. C. §78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U. S. C. §78*o*(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—

"(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by [a federal agency, Congress, or supervisor] . . . ." §806, 116 Stat. 802.[2]

Congress has assigned whistleblower protection largely to the Department of Labor (DOL), which administers some 20 United States Code incorporated whistleblower protection provisions. See 78 Fed. Reg. 3918 (2013). The Secretary has delegated investigatory and initial adjudicatory responsibility over claims under a number of these

_____

[2] As discussed *infra*, at 24–26, Congress amended §1514A in 2010 to extend whistleblower coverage to employees of public companies' subsidiaries and nationally recognized statistical ratings organizations. 124 Stat. 1848. Plaintiffs do not fall in either category and, in any event, their claims are governed by the prior version of §1514A. Unless otherwise noted, all citations to §1514A are to the original text in the 2006 edition of the United States Code.

provisions, including §1514A, to DOL's Occupational Safety and Health Administration (OSHA). *Ibid.* OSHA's order may be appealed to an administrative law judge, and then to DOL's Administrative Review Board (ARB). 29 CFR §§1980.104 to 1980.110 (2011).

In common with other whistleblower protection provisions enforced by DOL, see 77 Fed. Reg. 3912 (2012), the ARB's determination on a §1514A claim constitutes the agency's final decision and is reviewable in federal court under the standards stated in the Administrative Procedure Act, 5 U. S. C. §706. If, however, the ARB does not issue a final decision within 180 days of the filing of the complaint, and the delay is not due to bad faith on the claimant's part, the claimant may proceed to federal district court for *de novo* review. 18 U. S. C. §1514A(b). An employee prevailing in a proceeding under §1514A is entitled to "all relief necessary to make the employee whole," including "reinstatement with the same seniority status that the employee would have had, but for the discrimination," backpay with interest, and compensation for litigation costs. §1514A(c).

Congress modeled §1514A on the anti-retaliation provision of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), 49 U. S. C. §42121, a measure enacted two years earlier. See S. Rep., at 30 (corporate whistleblower protections "track [AIR 21's] protections as closely as possible"). Section 1514A incorporates by cross-reference AIR 21's administrative enforcement procedures. 18 U. S. C. §1514A(b)(2).

## B

Petitioners Jackie Hosang Lawson and Jonathan M. Zang (plaintiffs) separately initiated proceedings under §1514A against their former employers, privately held companies that provide advisory and management services to the Fidelity family of mutual funds. The Fidelity

funds are not parties to either case; as is common in the mutual fund industry, the Fidelity funds themselves have no employees. Instead, they contract with investment advisers like respondents to handle their day-to-day operations, which include making investment decisions, preparing reports for shareholders, and filing reports with the Securities and Exchange Commission (SEC). Lawson was employed by Fidelity Brokerage Services, LLC, a subsidiary of FMR Corp., which was succeeded by FMR LLC. Zang was employed by a different FMR LLC subsidiary, Fidelity Management & Research Co., and later by one of that company's subsidiaries, FMR Co., Inc. For convenience, we refer to respondents collectively as FMR.

Lawson worked for FMR for 14 years, eventually serving as a Senior Director of Finance. She alleges that, after she raised concerns about certain cost accounting methodologies, believing that they overstated expenses associated with operating the mutual funds, she suffered a series of adverse actions, ultimately amounting to constructive discharge. Zang was employed by FMR for eight years, most recently as a portfolio manager for several of the funds. He alleges that he was fired in retaliation for raising concerns about inaccuracies in a draft SEC registration statement concerning certain Fidelity funds. Lawson and Zang separately filed administrative complaints alleging retaliation proscribed by §1514A. After expiration of the 180-day period specified in §1514A(b)(1), Lawson and Zang each filed suit in the U. S. District Court for the District of Massachusetts.

FMR moved to dismiss the suits, arguing, as relevant, that neither plaintiff has a claim for relief under §1514A. FMR is privately held, and maintained that §1514A protects only employees of public companies—*i.e.,* companies that either have "a class of securities registered under section 12 of the Securities Exchange Act of 1934," or that are "required to file reports under section 15(d)" of that

Act. §1514A(a).[3]  In a joint order, the District Court rejected FMR's interpretation of §1514A and denied the dismissal motions in both suits.  724 F. Supp. 2d 141 (Mass. 2010).

On interlocutory appeal, a divided panel of the First Circuit reversed.  670 F. 3d 61 (2012).  The Court of Appeals majority acknowledged that FMR is a "contractor"[4] within the meaning of §1514A(a), and thus among the actors prohibited from retaliating against "an employee" who engages in protected activity.  The majority agreed with FMR, however, that "an employee" refers only to employees of public companies and does not cover a contractor's own employees.  *Id.,* at 68–80.  Judge Thompson dissented.  In her view, the majority had "impose[d] an unwarranted restriction on the intentionally broad language of the Sarbanes-Oxley Act" and "bar[red] a significant class of potential securities-fraud whistleblowers from any legal protection."  *Id.,* at 83.

Several months later, the ARB issued a decision in an unrelated case, *Spinner* v. *David Landau & Assoc., LLC*, No. 10–111 etc., ALJ No. 2010–SOX–029 (May 31, 2012),[5] disagreeing with the Court of Appeals' interpretation of §1514A.  In a comprehensive opinion, the ARB explained its position that §1514A affords whistleblower protection to employees of privately held contractors that render services to public companies.  *Ibid.*[6]

––––––––––

[3] Here, as just noted, the public company has no employees.  See *supra*, at 2.

[4] As §1514A treats contractors and subcontractors identically, we generally refer simply to "contractors" without distinguishing between the two.

[5] The whistleblower in *Spinner* was an employee of an accounting firm that provided auditing, consulting, and Sarbanes-Oxley compliance services to a public company.

[6] The dissent maintains that the ARB's interpretation of §1514A is not entitled to deference because, "if any agency has the authority to resolve ambiguities in §1514A with the force of law, it is the SEC, not

We granted certiorari, 569 U. S. \_\_\_ (2013), to resolve the division of opinion on whether §1514A extends whistleblower protection to employees of privately held contractors who perform work for public companies.

## II
## A

In determining the meaning of a statutory provision, "we look first to its language, giving the words used their ordinary meaning." *Moskal* v. *United States*, 498 U. S. 103, 108 (1990) (citation and internal quotation marks omitted). As Judge Thompson observed in her dissent from the Court of Appeals' judgment, "boiling [§1514A(a)] down to its relevant syntactic elements, it provides that 'no . . . contractor . . . may discharge . . . an employee.'" 670 F. 3d, at 84 (quoting §1514A(a)). The ordinary meaning of "an employee" in this proscription is the contractor's own employee.

FMR's interpretation of the text requires insertion of "of a public company" after "an employee." But where Congress meant "an employee of a public company," it said so: With respect to the actors governed by §1514A, the provi-

---

the Department of Labor." *Post,* at 18. Because we agree with the ARB's conclusion that §1514A affords protection to a contractor's employees, we need not decide what weight that conclusion should carry. We note, however, that the SEC apparently does not share the dissent's view that it, rather than DOL, has interpretive authority over §1514A. To the contrary, the SEC is a signatory to the Government's brief in this case, which takes the position that Congress has charged the Secretary of Labor with interpreting §1514A. Brief for United States as *Amicus Curiae* 9–11, 31–34. That view is hardly surprising given the lead role played by DOL in administering whistleblower statutes. See *supra,* at 5. The dissent observes that the SEC "has not issued a regulation applying §1514A whistleblower protection to employees of public company contractors," *post*, at 18, but omits to inform that the SEC has not promulgated *any* regulations interpreting §1514A, consistent with its view that Congress delegated that responsibility to DOL.

sion's interdictions run to the officers, employees, contractors, subcontractors, and agents "of such company," *i.e.,* a public company. §1514A(a). Another anti-retaliation provision in Sarbanes-Oxley provides: "[A] broker or dealer and persons employed by a broker or dealer who are involved with investment banking activities may not, directly or indirectly, retaliate against or threaten to retaliate against any securities analyst *employed by that broker or dealer or its affiliates . . . .*" 15 U. S. C. §78*o*–6(a)(1)(C) (emphasis added). In contrast, nothing in §1514A's language confines the class of employees protected to those of a designated employer. Absent any textual qualification, we presume the operative language means what it appears to mean: A contractor may not retaliate against its own employee for engaging in protected whistle-blowing activity.[7]

Section 1514A's application to contractor employees is confirmed when we enlarge our view from the term "an employee" to the provision as a whole. The prohibited retaliatory measures enumerated in §1514A(a)—discharge, demotion, suspension, threats, harassment, or discrimination in the terms and conditions of employment—are commonly actions an employer takes against its *own* employees. Contractors are not ordinarily positioned to take adverse actions against employees of the public company with whom they contract. FMR's interpretation of §1514A, therefore, would shrink to insignificance the provision's ban on retaliation by contractors. The dissent embraces FMR's "narrower" construction. See *post*, at 2, 3, 4, 7.

FMR urges that Congress included contractors in §1514A's list of governed actors simply to prevent public

---

[7] We need not decide in this case whether §1514A also prohibits a contractor from retaliating against an employee of one of the other actors governed by the provision.

companies from avoiding liability by employing contractors to effectuate retaliatory discharges. FMR describes such a contractor as an "ax-wielding specialist," illustrated by George Clooney's character in the movie Up in the Air.[8] Brief for Respondents 24–25 (internal quotation marks omitted). As portrayed by Clooney, an ax-wielding specialist is a contractor engaged only as the bearer of the bad news that the employee has been fired; he plays no role in deciding who to terminate. If the company employing the ax-wielder chose the recipients of the bad tidings for retaliatory reasons, the §1514A claim would properly be directed at the company. Hiring the ax-wielder would not insulate the company from liability. Moreover, we see no indication that retaliatory ax-wielding specialists are the real-world problem that prompted Congress to add contractors to §1514A.[9]

Moving further through §1514A to the protected activity described in subsection (a)(1), we find further reason to

———————

[8] This hypothetical originates in a Seventh Circuit opinion, *Fleszar* v. *United States Dept. of Labor*, 598 F. 3d 912, 915 (2010), and is mentioned in a footnote in the First Circuit's opinion in this case, 670 F. 3d 61, 69, n. 11 (2012).

[9] When asked during oral argument for an example of actual circumstances in which a contractor would have employment decisionmaking authority over public company employees, FMR's counsel cited *Kalkunte* v. *DVI Financial Servs.*, *Inc.,* No. 05–139 etc., ALJ No. 2004– SOX–056 (Feb. 27, 2009). Tr. of Oral Arg. 33. That case involved a bankrupt public company that hired a private company to handle its dissolution. The ARB found the private company liable under §1514A because it acted as a "contractor, subcontractor, *or agent*" of the public company in discharging the claimant. ALJ No. 2004–SOX–056, at 10 (emphasis added). Neither FMR nor its *amici* have pointed us to any actual situation in which a public company employee would be vulnerable to retaliatory conduct by a contractor not already covered as an "agent" under §1514A. Notably, even in *Tides* v. *The Boeing Co.*, 644 F. 3d 809 (CA9 2011), the case cited by the dissent for the proposition that contractors may possess "managerial authority" over public company employees, *post*, at 10, the alleged retaliation was by the public company itself.

believe that Congress presumed an employer-employee relationship between the retaliator and the whistleblower. Employees gain protection for furnishing information to a federal agency, Congress, or "a person with supervisory authority over *the employee* (or such other person working for *the employer* who has the authority to investigate, discover, or terminate misconduct)." §1514A(a)(1) (emphasis added). And under §1514A(a)(2), employees are protected from retaliation for assisting "in a proceeding filed or about to be filed (*with any knowledge of the employer*) relating to an alleged violation" of any of the enumerated fraud provisions, securities regulations, or other federal law relating to shareholder fraud. §1514A(a)(2) (emphasis added). The reference to employer knowledge is an additional indicator of Congress' expectation that the retaliator typically will be the employee's employer, not another entity less likely to know of whistleblower complaints filed or about to be filed.

Section 1514A's enforcement procedures and remedies similarly contemplate that the whistleblower is an employee of the retaliator. As earlier noted, see *supra,* at 6, §1514A(b)(2)(A) provides that a claim under §1514A "shall be governed under the rules and procedures set forth in section 42121(b) of title 49," *i.e.,* AIR 21's anti-retaliation provision. Throughout §42121(b), the respondent is referred to as "the employer." See 49 U. S. C. §42121(b)(2)(B)(ii) (The Secretary shall not conduct an investigation into a retaliation claim "if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior."); §42121(b)(2)(B)(iv) ("Relief may not be ordered . . . if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior.").

Regarding remedies, §1514A(c)(2) states that a success-

ful claimant shall be entitled to "reinstatement with the same seniority status that the employee would have had, but for the discrimination," as well as "the amount of back pay, with interest." As the Solicitor General, for the United States as *amicus curiae*, observed, "It is difficult, if not impossible, to see how a contractor or subcontractor could provide those remedies to an employee of a public company." Brief for United States as *Amicus Curiae* 15. The most sensible reading of §1514A's numerous references to an employer-employee relationship between the respondent and the claimant is that the provision's protections run between contractors and their own employees.

Remarkably, the dissent attributes to Congress a strange design. Under the dissent's "narrower" construction, *post,* at 2, 3, 4, 7, a public company's contractor may not retaliate against a public company's employees, academic here because the public company has no employees. According to the dissent, this coverage is necessary to prevent "a gaping hole" that would allow public companies to "evade §1514A simply by hiring a contractor to engage in the very retaliatory acts that an officer or employee could not." *Post*, at 10. This cannot be right—even if Congress had omitted any reference to contractors, subcontractors, or agents in §1514A, the remaining language surely would prohibit a public company from directing someone else to engage in retaliatory conduct against the public company's employees; hiring an ax-wielder to announce an employee's demotion does not change the fact that the public company is the entity commanding the demotion. Under the dissent's reading of §1514A, the inclusion of contractors as covered employers does no more than make the contractor secondarily liable for complying with such marching orders—hardly a hole at all.[10]

—————

[10] The dissent suggests that we "fai[l] to recognize" that its construction also makes contractors primarily liable for retaliating of their own

There would be a huge hole, on the other hand, were the dissent's view of §1514A's reach to prevail: Contractors' employees would be disarmed; they would be vulnerable to retaliation by their employers for blowing the whistle on a scheme to defraud the public company's investors, even a scheme engineered entirely by the contractor. Not only would mutual fund advisers and managers escape §1514A's control. Legions of accountants and lawyers would be denied §1514A's protections. See *infra*, at 19–22. Instead of indulging in fanciful visions of whistleblowing babysitters and the like, *post*, at 1–2, 6, 12–13, 20, the dissent might pause to consider whether a Congress, prompted by the Enron debacle, would exclude from whistleblower protection countless professionals equipped to bring fraud on investors to a halt.

B

We turn next to two textual arguments made by FMR. First, FMR urges that "an employee" must be read to refer exclusively to public company employees to avoid the absurd result of extending protection to the personal employees of company officers and employees, *e.g.,* their housekeepers or gardeners. See Brief for Respondents 19–20; *post*, at 1–2, 6, 12–13, 20. Plaintiffs and the Solicitor General do not defend §1514A's application to personal employees. They argue, instead, that the prohibition against an "officer" or "employee" retaliating against "an employee" may be read as imposing personal liability only on officers and employees who retaliate against other public company employees. Brief for Petitioners 12; Brief

_____

volition against employees of public companies. *Post*, at 10, n. 6. As explained *supra,* at 11–12, n. 9, however, FMR and its supporters have identified not even one real-world instance of a public company employee asserting a §1514A claim alleging retaliatory conduct by a contractor. Again, no "gaping hole," practically no hole at all.

for United States as *Amicus Curiae* 16.[11]  FMR calls this reading "bizarre," for it would ascribe to the words "an employee" in §1514A(a) "one meaning if the respondent is an 'officer' and a different meaning if the respondent is a 'contractor.'"  Brief for Respondents 20–21.

We agree with FMR that plaintiffs and the Solicitor General offer an interpretation at odds with the text Congress enacted.  If, as we hold, "an employee" includes employees of contractors, then grammatically, the term also includes employees of public company officers and employees.  Nothing suggests Congress' attention was drawn to the curiosity its drafting produced.  The issue, however, is likely more theoretical than real.  Few housekeepers or gardeners, we suspect, are likely to come upon and comprehend evidence of their employer's complicity in fraud.  In any event, FMR's point is outweighed by the compelling arguments opposing FMR's contention that "an employee" refers simply and only to public company employees.  See *supra,* at 9–14.  See also *infra*, at 23–24 (limiting principles may serve as check against overbroad applications).

Second, FMR argues that the statutory headings support the exclusion of contractor employees from §1514A's protections.  Although §1514A's own heading is broad ("Civil action to protect against retaliation in fraud cases"), subsection (a) is captioned "Whistleblower Protection for Employees of Publicly Traded Companies."  Similarly, the relevant public law section, §806 of Sarbanes-Oxley, is captioned "Protection for Employees of Publicly Traded Companies Who Provide Evidence of Fraud."  116

––––––––––

[11] The ARB endorsed this view in *Spinner* v. *David Landau & Assoc., LLC*, No. 10–111 etc., ALJ No. 2010–SOX–029, p. 8 (May 31, 2012).  We have no occasion to determine whether the ARB would be entitled to deference in this regard, for, as explained in text, we find that the statutory text unambiguously affords protection to personal employees of public company officers and employees.  §1514A(a).

Stat. 802. The Court of Appeals described the latter two headings as "explicit guides" limiting protection under §1514A to employees of public companies. 670 F. 3d, at 69.

This Court has placed less weight on captions. In *Trainmen* v. *Baltimore & Ohio R. Co.*, 331 U. S. 519 (1947), we explained that where, as here, "the [statutory] text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner." *Id.,* at 528. The under-inclusiveness of the two headings relied on by the Court of Appeals is apparent. The provision indisputably extends protection to employees of companies that file reports with the SEC pursuant to §15(d) of the 1934 Act, even when such companies are not "publicly traded." And the activity protected under §1514A is not limited to "provid[ing] evidence of fraud"; it also includes reporting violations of SEC rules or regulations. §1514A(a)(1). As in *Trainmen*, the headings here are "but a short-hand reference to the general subject matter" of the provision, "not meant to take the place of the detailed provisions of the text." 331 U. S., at 528. Section 1514A is attended by numerous indicators that the statute's prohibitions govern the relationship between a contractor and its own employees; we do not read the headings to "undo or limit" those signals. *Id.,* at 529.[12]

### III

### A

Our textual analysis of §1514A fits the provision's purpose. It is common ground that Congress installed whistleblower protection in the Sarbanes-Oxley Act as one

---

[12] AIR 21's anti-retaliation provision, on which §1514A is based, includes a similarly composed heading, "Discrimination against airline employees." 49 U. S. C. §42121(a). Nevertheless, that provision has been read to cover employees of companies rendering contract services to airlines. See *infra*, at 27–29.

means to ward off another Enron debacle. S. Rep., at 2–11. And, as the ARB observed in *Spinner*, "Congress plainly recognized that outside professionals—accountants, law firms, contractors, agents, and the like—were complicit in, if not integral to, the shareholder fraud and subsequent cover-up [Enron] officers . . . perpetrated." ALJ No. 2010–SOX–029, pp. 12–13. Indeed, the Senate Report demonstrates that Congress was as focused on the role of Enron's outside contractors in facilitating the fraud as it was on the actions of Enron's own officers. See, *e.g.,* S. Rep., at 3 (fraud "occurred with extensive participation and structuring advice from Arthur Andersen . . . which was simultaneously serving as both consultant and independent auditor for Enron" (internal quotation marks and brackets omitted)); *id.,* at 4 ("professionals from accounting firms, law firms and business consulting firms, who were paid millions to advise Enron on these practices, assured others that Enron was a solid investment"); *id.,* at 4–5 (team of Andersen employees were tasked with destroying "physical evidence and documents" relating to Enron's fraud); *id.,* at 5 ("Enron and Andersen were taking advantage of a system that allowed them to behave in an apparently fraudulent manner"); *id.,* at 11 (Enron's fraud partly attributable to "the well-paid professionals who helped create, carry out, and cover up the complicated corporate ruse when they should have been raising concerns"); *id.,* at 20–21 ("Enron's accountants and lawyers brought all their skills and knowledge to bear in assisting the fraud to succeed and then in covering it up.").

Also clear from the legislative record is Congress' understanding that outside professionals bear significant responsibility for reporting fraud by the public companies with whom they contract, and that fear of retaliation was the primary deterrent to such reporting by the employees of Enron's contractors. Congressional investigators discovered ample evidence of contractors demoting or dis-

charging employees they have engaged who jeopardized the contractor's business relationship with Enron by objecting to Enron's financial practices. See, *e.g.,* Oppel, Merrill Replaced Research Analyst Who Upset Enron, N. Y. Times, July 30, 2002, p. A1 ("In the summer of 1998, when it was eager to win more investment banking business from Enron, Merrill Lynch replaced a research analyst who had angered Enron executives by rating the company's stock 'neutral' with an analyst who soon upgraded the rating, according to Congressional investigators."); Yost, Andersen Whistleblower Was Removed, Associated Press (Apr. 3, 2002) (Congressional investigation reveals that Andersen removed one of its partners from its Enron team after Enron officials expressed unhappiness with the partner's questioning of certain accounting practices); Oppel, The Man Who Paid the Price for Sizing up Enron, N. Y. Times, Mar. 27, 2002, p. C1 ("Enron executives pressed UBS PaineWebber to take action against a broker who advised some Enron employees to sell their shares in August and was fired by the brokerage firm within hours of the complaint, according to e-mail messages released today by Congressional investigators.").

In the same vein, two of the four examples of whistleblower retaliation recounted in the Senate Report involved outside professionals retaliated against by their own employers. S. Rep., at 5 (on Andersen and UBS Paine-Webber employees); see also *id.,* at 4–5 (Andersen employees who "attempted to report or 'blow the whistle' on [Enron's] fraud . . . were discouraged at nearly every turn"). Emphasizing the importance of outside professionals as "gatekeepers who detect and deter fraud," the Senate Report concludes: "Congress must reconsider the incentive system that has been set up that encourages accountants and lawyers who come across fraud in their work to remain silent." *Id.,* at 20–21. From this legisla-

tive history, one can safely conclude that Congress enacted §1514A aiming to encourage whistleblowing by contractor employees who suspect fraud involving the public companies with whom they work.[13]

FMR argues that Congress addressed its concerns about the role of outside accountants and lawyers in facilitating Enron's wrongdoing, not in §1514A, but exclusively in other provisions of Sarbanes-Oxley "*directly* regulat[ing] accountants and lawyers." Brief for Respondents 40. In particular, FMR points to sections of the Act requiring accountants and lawyers for public companies to investigate and report misconduct, or risk being banned from further practice before the SEC. *Id.,* at 41 (citing 15 U. S. C. §§7215(c)(4), 7245). These requirements, however, indicate why Congress would have wanted to extend §1514A's coverage to the many lawyers and accountants who perform outside work for public companies. Although lawyers and accountants are subject to extensive regulations and sanctions throughout Sarbanes-Oxley, no provision of the Act other than §1514A affords them protection from retaliation by their employers for complying with the Act's reporting requirements.[14] In short, we cannot coun-

_____

[13] FMR urges that the Senate Report's references to "employees of publicly traded companies" demonstrate that Congress wanted to limit whistleblower protection to such employees. Brief for Respondents 30–31. This argument fails for the same reason that FMR's reliance on the statutory section headings fails: "employees of publicly traded companies" must be understood as shorthand not designed to capture every employee covered by §1514A. See *supra,* at 15–16. Senator Sarbanes' statement, cited in the concurring opinion, *post*, at 2, is similarly imprecise. The Act indisputably covers private accounting firms and law firms that provide services to public companies. See, *e.g*., 15 U. S. C. §§7215, 7245. Indeed, Senator Sarbanes acknowledged this point in his very next sentence. See 148 Cong. Rec. 14440 (2002) (remarks of Sen. Sarbanes) ("This legislation prohibits accounting firms from providing certain specified consulting services if they are also the auditors of the company.").

[14] The dissent suggests that the Public Company Accounting Oversight

tenance the position advanced by FMR and the dissent, see *post,* at 14–16, that Congress intended to leave these professionals vulnerable to discharge or other retaliatory action for complying with the law.

B

Our reading of §1514A avoids insulating the entire mutual fund industry from §1514A, as FMR's and the dissent's "narrower construction" would do. As companies "required to file reports under section 15(d) of the Securities Exchange Act of 1934," 18 U. S. C. §1514A(a), mutual funds unquestionably are governed by §1514A. Because mutual funds figure prominently among such report-filing companies, Congress presumably had them in mind when it added to "publicly traded companies" the discrete category of companies "required to file reports under section 15(d)."

Virtually all mutual funds are structured so that they have no employees of their own; they are managed, instead, by independent investment advisers. See S. Rep. No. 91–184, p. 5 (1969) (accompanying the 1970 amendments to the Investment Company Act of 1940). The United States investment advising industry manages $14.7 trillion on behalf of nearly 94 million investors. See 2013 Investment Company Fact Book 7 (53d ed.), available at http://www.icifactbook.org/pdf/2013_factbook.pdf (as visited Feb. 20, 2014, and available in Clerk of Court's case file). These investment advisers, under our reading

———————

Board's and the SEC's authority to sanction unprofessional conduct by accountants and lawyers, respectively, "could well provide" a disincentive to retaliate against other accountants and lawyers. See *post*, at 15. The possibility of such sanctions, however, is cold comfort to the accountant or lawyer who loses her job in retaliation for her efforts to comply with the Act's requirements if, as the dissent would have it, §1514A does not enable her to seek reinstatement or backpay.

of §1514A, are contractors prohibited from retaliating against their own employees for engaging in whistleblow-ing activity. This construction protects the "insiders [who] are the only firsthand witnesses to the [shareholder] fraud." S. Rep., at 10. Under FMR's and the dissent's reading, in contrast, §1514A has no application to mutual funds, for all of the potential whistleblowers are employed by the privately held investment management companies, not by the mutual funds themselves. See Brief for Re-spondents 45 (describing this glaring gap as "merely a consequence of the corporate structure" of mutual funds).

The Court of Appeals found exclusion of the mutual fund industry from §1514A tenable because mutual funds and their investment advisers are separately regulated under the Investment Company Act of 1940, 15 U. S. C. §80a–1 *et seq.,* the Investment Advisers Act of 1940, 15 U. S. C. §80b–1 *et seq.,* and elsewhere in Sarbanes-Oxley. 670 F. 3d, at 72–73. See also *post*, at 16–17, n. 10. But this separate regulation does not remove the problem, for nowhere else in these legislative measures are investment management employees afforded whistleblower protection. Section 1514A alone shields them from retaliation for bringing fraud to light.

Indeed, affording whistleblower protection to mutual fund investment advisers is crucial to Sarbanes-Oxley's endeavor to "protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws." 116 Stat. 745. As plaintiffs observe, these disclosures are written, not by anyone at the mutual funds themselves, but by employees of the investment advisers. "Under FMR's [and the dissent's] proposed in-terpretation of section 1514A, FMR could dismiss any FMR employee who disclosed to the directors of or lawyers for the Fidelity funds that there were material falsehoods in the documents being filed by FMR with the SEC in the name of those funds." Reply Brief 13. It is implausible

that Congress intended to leave such an employee remedi-
less. See *id.,* at 14.

C

Unable credibly to contest the glaring under-
inclusiveness of the "narrower reading" FMR urges, the
dissent emphasizes instead FMR's claim that the reading
of §1514A we adopt is all too inclusive. See *post*, at 1–2, 6,
12–13, 20–21. FMR's *amici* also press this point, observ-
ing that the activity protected under §1514A(a)(1) encom-
passes reporting not only securities fraud (18 U. S. C.
§1348), but also mail, wire, and bank fraud (§§1341, 1343,
1344). Including contractor employees in the protected
class, they therefore assert, could "cas[t] a wide net over
employees who have no exposure to investor-related activ-
ities and thus could not possibly assist in detecting inves-
tor fraud." Brief for Chamber of Commerce of the United
States of America as *Amicus Curiae* 3. See also Brief for
Securities Industry and Financial Markets Association as
*Amicus Curiae* 7–16.

There is scant evidence, however, that these floodgate-
opening concerns are more than hypothetical. DOL's
regulations have interpreted §1514A as protecting con-
tractor employees for almost a decade.[15] See 69 Fed. Reg.
52105–52106 (2004). Yet no "narrower construction"
advocate has identified even a single case in which the
employee of a private contractor has asserted a §1514A
claim based on allegations unrelated to shareholder fraud.
FMR's parade of horribles rests solely on *Lockheed Martin
Corp.* v. *ARB*, 717 F. 3d 1121 (CA10 2013), a case involv-
ing mail and wire fraud claims asserted by an employee of

———————

[15] Although the dissent suggests that the ARB had not provided "de-
finitive clarification" on the issue prior to *Spinner*, *post* at 14, the ARB
"repeatedly interpreted [§1514A] as affording whistleblower protection
to employees of [private] contractors" before *Spinner*. See *Spinner*, No.
10–111 etc., ALJ No. 2010–SOX–029, p. 5 (citing prior decisions).

a *public* company—*i.e.,* claims in no way affected by today's decision. The dissent's fears that household employees and others, on learning of today's decision, will be prompted to pursue retaliation claims, *post,* at 13, and that OSHA will find them meritorious under §1514A, seem to us unwarranted. If we are wrong, however, Congress can easily fix the problem by amending §1514A explicitly to remove personal employees of public company officers and employees from the provision's reach. But it would thwart Congress' dominant aim if contractors were taken off the hook for retaliating against their whistle-blowing employees, just to avoid the unlikely prospect that babysitters, nannies, gardeners, and the like will flood OSHA with §1514A complaints.

Plaintiffs and the Solicitor General observe that over-breadth problems may be resolved by various limiting principles. They point specifically to the word "contractor." Plaintiffs note that in "common parlance," "contractor" does not extend to every fleeting business relationship. Instead, the word "refers to a party whose performance of a contract will take place over a significant period of time." Reply Brief 16. See also *Fleszar* v. *United States Dept. of Labor*, 598 F. 3d 912, 915 (CA7 2010) ("Nothing in §1514A implies that, if [a privately held business] buys a box of rubber bands from Wal-Mart, a company with traded securities, the [business] becomes covered by §1514A.").

The Solicitor General further maintains that §1514A protects contractor employees only to the extent that their whistleblowing relates to "the contractor . . . fulfilling its role as a contractor for the public company, not the contractor in some other capacity." Tr. of Oral Arg. 18–19 (Government counsel). See also *id.,* at 23 ("[I]t has to be a person who is in a position to detect and report the types of fraud and securities violations that are included in the statute. . . . [W]e think that 'the contractor of such com-

pany' refers to the contractor in that role, working for the public company.'").

Finally, the Solicitor General suggests that we need not determine the bounds of §1514A today, because plaintiffs seek only a "mainstream application" of the provision's protections. *Id.,* at 20 (Government counsel). We agree. Plaintiffs' allegations fall squarely within Congress' aim in enacting §1514A. Lawson alleges that she was constructively discharged for reporting accounting practices that overstated expenses associated with managing certain Fidelity mutual funds. This alleged fraud directly implicates the funds' shareholders: "By inflating its expenses, and thus understating its profits, [FMR] could potentially increase the fees it would earn from the mutual funds, fees ultimately paid by the shareholders of those funds." Brief for Petitioners 3. Zang alleges that he was fired for expressing concerns about inaccuracies in a draft registration statement FMR prepared for the SEC on behalf of certain Fidelity funds. The potential impact on shareholders of false or misleading registration statements needs no elaboration. If Lawson and Zang's allegations prove true, these plaintiffs would indeed be "firsthand witnesses to [the shareholder] fraud" Congress anticipated §1514A would protect. S. Rep., at 10.

### D

FMR urges that legislative events subsequent to Sarbanes-Oxley's enactment show that Congress did not intend to extend §1514A's protections to contractor employees.[16] In particular, FMR calls our attention to the

---

[16] We can easily dismiss FMR's invocation of a failed bill from 2004, the Mutual Fund Reform Act, S. 2059, 108th Cong., 2d Sess., §116(b), which would have amended §1514A explicitly to cover employees of investment advisers and affiliates. Brief for Respondents 34–35. "[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *United States* v.

2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1376 (Dodd-Frank). Dodd-Frank amended §1514A(a) to read:

> "No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U. S. C. 78*l*), or that is required to file reports under [section 12] of the [1934 Act] (15 U. S. C. 78*o*(d)) *including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the [1934 Act] (15 U. S. C. 78c)*, or any officer, employee, contractor, subcontractor, or agent of such company *or nationally recognized statistical rating organization*, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any [protected activity]." 18 U. S. C. §1514A(a) (2012 ed.) (emphasis added; footnote omitted.)

The amended provision extends §1514A's protection to employees of public company subsidiaries and nationally recognized statistical rating organizations (NRSROs). FMR asserts that Congress' decision to add NRSROs to §1514A shows that the provision did not previously cover contractor employees: "If [§1514A] already covered every private company contracting with a public company, there would have been no need for Congress to extend [§1514A] to certain private companies." Brief for Respondents 35–36. This argument fails at the starting gate, for FMR

---

*Craft*, 535 U. S. 274, 287 (2002) (internal quotation marks omitted). Where, as here, the proposed amendment amounted to six lines in a 51-page bill that died without any committee action, its failure is scarcely relevant to Congress' intentions regarding a different bill enacted two years earlier.

concedes that not all NRSROs are privately held, and not all NRSROs contract with public companies. *Id.*, at 36.

We see nothing useful to our inquiry in Congress' decision to amend §1514A to include public company subsidiaries and NRSROs. More telling, at the time of the Dodd-Frank amendments, DOL regulations provided that §1514A protects contractor employees. See 29 CFR §1980.101 (2009). Congress included in its alterations no language gainsaying that protection. As Judge Thompson's dissent from the First Circuit's judgment observes, "Congress had a miles-wide opening to nip [DOL's] regulation in the bud if it had wished to do so. It did not." 670 F. 3d, at 88.

Dodd-Frank also establishes a corporate whistleblowing reward program, accompanied by a new provision prohibiting any employer from retaliating against "a whistleblower" for providing information to the SEC, participating in an SEC proceeding, or making disclosures required or protected under Sarbanes-Oxley and certain other securities laws. 15 U. S. C. §78u–6(a)(6), (b)(1), (h). FMR urges that, as this provision covers employees of all companies, public or private, "[t]here is no justification" for reading §1514A to cover employees of contractors: "Any 'gap' that might, *arguendo*, have existed for employees of private entities between 2002 and 2010 has now been closed." Brief for Respondents 44.[17]

FMR, we note, somewhat overstates Dodd-Frank's coverage. Section 1514A's protections include employees who provide information to any "person with supervisory authority over the employee." §1514A(a)(1)(C). Dodd-Frank's whistleblower provision, however, focuses primarily on reporting to federal authorities. See Brief for United States as *Amicus Curiae* 30 ("[I]f employees of contrac-

—————————

[17] FMR acknowledges that plaintiffs' claims could have proceeded under Dodd-Frank, but for the date of enactment. Brief for Respondents 43.

tors of public companies are not protected under Section 1514A, they are not protected for making internal complaints under . . . the Dodd-Frank Act.").

In any event, our task is not to determine whether including contractor employees in the class protected by §1514A remains necessary in 2014. It is, instead, to determine whether Congress afforded protection to contractor employees when it enacted §1514A in 2002. If anything relevant to our inquiry can be gleaned from Dodd-Frank, it is that Congress apparently does not share FMR's concerns about extending protection comprehensively to corporate whistleblowers.[18]

## IV

We end by returning to AIR 21's whistleblower protection provision, 49 U. S. C. §42121, enacted two years before Sarbanes-Oxley. Congress designed §1514A to "track . . . as closely as possible" the protections afforded by §42121. S. Rep., at 30. To this end, §1514A incorporates by cross-reference §42121's administrative enforcement regime, see 18 U. S. C. §1514A(b)(2), and contains parallel statutory text. Compare §1514A(a) ("No [public] company . . . or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment" for engaging in protected activity) with 49 U. S. C. §42121(a) ("No air carrier or contractor or subcontractor of an air carrier may discharge an employee or otherwise discriminate against an employee with respect

————————

[18] Section 1107 of the Act is of similar breadth, declaring it a criminal offense to "tak[e] any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense." 18 U. S. C. §1513(e).

to compensation, terms, conditions, or privileges of em-
ployment" for engaging in protected activity).[19]

Section 42121 has been read to protect employees of
contractors covered by the provision. The ARB has con-
sistently construed AIR 21 to cover contractor employees.
*E.g., Evans* v. *Miami Valley Hospital*, ARB No. 07–118
etc., ALJ No. 2006–AIR–022, pp. 9–11 (June 30, 2009);
*Peck* v. *Safe Air Int'l, Inc.,* ARB No. 02–028, ALJ No.
2001–AIR–3, p. 13 (Jan. 30, 2004).[20] And DOL's regula-
tions adopting this interpretation of §42121 date back to
April 1, 2002, before §1514A was enacted. 67 Fed. Reg.
15454, 15457–15458 (2002). The Senate Report for AIR 21
supports this reading, explaining that the Act "provide[s]
employees of airlines, and employees of airline contractors
and subcontractors, with statutory whistleblower protec-
tion." S. Rep. No. 105–278, p. 22 (1998).[21]

The Court of Appeals recognized that Congress modeled
§1514A on §42121, and that §42121 has been understood
to protect contractor employees. 670 F. 3d, at 73–74. It
nonetheless declined to interpret §1514A the same way,
because, in its view, "important differences" separate the
two provisions. First, unlike §1514A, §42121 contains a

-------

[19] For other provisions borrowing from AIR 21, see 49 U. S. C. §20109,
governing rail carriers, which incorporates AIR 21's enforcement
procedures, and §31105, governing motor carriers, which incorporates
AIR 21's proof burdens.

[20] The ARB has also interpreted similarly worded whistleblower pro-
tection provisions in the Pipeline Safety Improvement Act of 2002, 49
U. S. C. §60129(a), and the Energy Reorganization Act of 1974, 42
U. S. C. §5851(a), as protecting employees of contractors. See *Rocha* v.
*AHR Utility Corp.*, ARB No. 07–112, ALJ No. 2006–PSI–001 etc., p. 2
(June 25, 2009); *Robinson* v. *Triconex Corp.*, ARB No. 10–013, ALJ No.
2006–ERA–031, pp. 8–9 (Mar. 28, 2012).

[21] FMR protests that there is no court of appeals precedent on point,
Brief for Respondents 24, n. 6, but the courts of appeals are not, of
course, the only lodestar for determining whether a proposition of law
is plainly established.

definition of "contractor": "a company that performs safety-sensitive functions by contract for an air carrier." 49 U. S. C. §42121(e). Second, unlike §1514A, §42121 does not include "officers" or "employees" among governed actors. 670 F. 3d, at 74. These distinctions, the Court of Appeals reasoned, render §1514A less amenable to an inclusive construction of the protected class. *Ibid.*[22]

We do not find these textual differences overwhelming. True, Congress strayed from §42121's pattern in failing to define "contractor" for purposes of §1514A, and in adding "officers" and "employees" to §1514A's list of governed actors. And we agree that §1514A covers a far wider range than §42121 does. But in our view, neither difference warrants the determination that §1514A omits employees of contractors while §42121 includes them. The provisions' parallel text and purposes counsel in favor of interpreting the two provisions consistently. And we have already canvassed the many reasons why §1514A is most sensibly read to protect employees of contractors. See *supra,* at 9–22.

\*　\*　\*

For the reasons stated, we hold that 18 U. S. C. §1514A whistleblower protection extends to employees of contractors and subcontractors. The judgment of the U. S. Court of Appeals for the First Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[22] The dissent suggests the provisions' headings are also distinguishable because §42121's title—"Protection of employees providing air safety information"—"comfortably encompasses the employees of contractors." *Post*, at 8. The dissent omits, however, the subsection heading directly following the title: "Discrimination against airline employees." §42121(a).

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 12–3

––––––––––

## JACKIE HOSANG LAWSON AND JONATHAN M. ZANG, PETITIONERS *v.* FMR LLC ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[March 4, 2014]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in principal part and concurring in the judgment.

I agree with the Court's conclusion that 18 U. S. C. §1514A protects employees of private contractors from retaliation when they report covered forms of fraud. As the Court carefully demonstrates, that conclusion logically flows from §1514A's text and broader context. I therefore join the Court's opinion in principal part.

I do not endorse, however, the Court's occasional excursions beyond the interpretative terra firma of text and context, into the swamps of legislative history. Reliance on legislative history rests upon several frail premises. First, and most important: That the statute means what Congress intended. It does not. Because we are a government of laws, not of men, and are governed by what Congress enacted rather than by what it intended, the sole object of the interpretative enterprise is to determine what a law *says*. Second: That there *was* a congressional "intent" apart from that reflected in the enacted text. On most issues of detail that come before this Court, I am confident that the majority of Senators and Representatives had no views whatever on how the issues should be resolved—indeed, were unaware of the issues entirely. Third: That the views expressed in a committee report or a

floor statement represent those of all the Members of that
House. Many of them almost certainly did not read the
report or hear the statement, much less agree with it—not
to mention the Members of the other House and the Presi-
dent who signed the bill.

Since congressional "intent" apart from enacted text is
fiction to begin with, courts understandably allow them-
selves a good deal of poetic license in defining it. Today's
opinion is no exception. It cites parts of the legislative
record that are consistent with its holding that §1514A
covers employees of private contractors and subcontrac-
tors, but it ignores other parts that unequivocally cut in
the opposite direction. For example, the following remark
by the Sarbanes-Oxley Act's lead sponsor in the Senate:
"[L]et me make very clear that [the Act] applies exclusively
to public companies—that is, to companies registered
with the Securities and Exchange Commission. It is not
applicable to pr[i]v[at]e companies,[*] who make up the
vast majority of companies across the country." 148 Cong.
Rec. 14440 (2002) (remarks of Sen. Sarbanes).

Two other minor points in the Court's opinion I do not
agree with. First, I do not rely on the fact that a separate
anti-retaliation provision, 49 U. S. C. §42121(a), "has been
read" by an administrative tribunal to cover contractor
employees. *Ante*, at 29. Section 1514A(b)(2), entitled
"Procedure," contains cross-references to the procedural
rules set forth in §42121(b), but the substantive provisions
of §1514A(a) are worded quite differently from the sub-
stantive prohibition of §42121, which is contained in sub-
section (a)—thus making interpretation of the latter an
unreliable guide to §1514A's meaning. Second, I do not
agree with the Court's acceptance of the possible validity

—————

*The Congressional Record reads "provide companies," but context as
well as grammar makes clear that this is a scrivener's error for "private
companies."

of the Government's suggestion that "§1514A protects contractor employees only to the extent that their whistle-blowing relates to 'the contractor . . . fulfilling its role as a contractor for the public company.'" *Ante,* at 23 (quoting Tr. of Oral Arg. 18–19). Although that "limiting princi-pl[e]," *ibid.*, may be appealing from a policy standpoint, it has no basis whatsoever in the statute's text. So long as an employee works for one of the actors enumerated in §1514A(a) and reports a covered form of fraud in a manner identified in §1514(a)(1)–(2), the employee is protected from retaliation.

For all the other reasons given by the Court, the stat-ute's text is clear, and I would reverse the judgment of the Court of Appeals and remand the case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–3

_____

## JACKIE HOSANG LAWSON AND JONATHAN M. ZANG, PETITIONERS *v.* FMR LLC ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[March 4, 2014]

JUSTICE SOTOMAYOR, with whom JUSTICE KENNEDY and JUSTICE ALITO join, dissenting.

Section 806 of the Sarbanes-Oxley Act of 2002, 116 Stat. 802, forbids any public company,[1] or any "officer, employee, contractor, subcontractor, or agent of such company," to retaliate against "an employee" who reports a potential fraud. 18 U. S. C. §1514A(a). The Court recognizes that the core purpose of the Act is to "safeguard investors in public companies." *Ante,* at 1. And the Court points out that Congress entitled the whistleblower provision, "Protection for Employees of Publicly Traded Companies Who Provide Evidence of Fraud." §806, 116 Stat. 802. Despite these clear markers of intent, the Court does not construe §1514A to apply only to public company employees who blow the whistle on fraud relating to their public company employers. The Court instead holds that the law encompasses any household employee of the millions of people who work for a public company and any employee of the hundreds of thousands of private businesses that contract

_____

[1] The majority uses the term "public company" as shorthand for 18 U. S. C. §1514A's reference to companies that either have "'a class of securities registered under section 12 of the Securities Exchange Act of 1934,'" or that are "'required to file reports under section 15(d).'" *Ante,* at 7–8. I do the same.

to perform work for a public company.

The Court's interpretation gives §1514A a stunning reach. As interpreted today, the Sarbanes-Oxley Act authorizes a babysitter to bring a federal case against his employer—a parent who happens to work at the local Walmart (a public company)—if the parent stops employing the babysitter after he expresses concern that the parent's teenage son may have participated in an Internet purchase fraud. And it opens the door to a cause of action against a small business that contracts to clean the local Starbucks (a public company) if an employee is demoted after reporting that another nonpublic company client has mailed the cleaning company a fraudulent invoice.

Congress was of course free to create this kind of sweeping regime that subjects a multitude of individuals and private businesses to litigation over fraud reports that have no connection to, or impact on, the interests of public company shareholders. But because nothing in the text, context, or purpose of the Sarbanes-Oxley Act suggests that Congress actually wanted to do so, I respectfully dissent.

I

Although the majority correctly starts its analysis with the statutory text, it fails to recognize that §1514A is deeply ambiguous. Three indicators of Congress' intent clearly resolve this ambiguity in favor of a narrower interpretation of §1514A: the statute's headings, the statutory context, and the absurd results that follow from the majority's interpretation.

A

The majority begins its textual analysis by declaring that the "'relevant syntactic elements'" of §1514A are that "'"no . . . contractor . . . may discharge . . . an employee."'" *Ante,* at 9. After "'boiling . . . down'" the text to this for-

mulation, the majority concludes that the "ordinary meaning of 'an employee'" is obviously "the contractor's own employee." *Ibid.*

If that were what the statute said, the majority's decision would undoubtedly be correct. But §1514A(a) actually provides that "[n]o [public] company . . . or any officer, employee, contractor, subcontractor, or agent of such company . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee." The provision thus does not speak only (or even primarily) to "contractors." It speaks to public companies, and then includes a list of five types of representatives that companies hire to carry out their business: "officer[s], employee[s], contractor[s], subcontractor[s], [and] agent[s]."

Read in full, then, the statute is ambiguous. The majority is correct that it may be read broadly, to create a cause of action both for employees of public companies and for employees of the enumerated public company representatives. But the statute can also be read more narrowly, to prohibit the public company and the listed representatives—all of whom act on the company's behalf—from retaliating against just the public company's employees.

The narrower reading of the text makes particular sense when one considers the other terms in the list of company representatives. The majority acknowledges that, as a matter of "gramma[r]," the scope of protected employees must be consistent with respect to all five types of company representatives listed in §1514A(a). *Ante,* at 15. Yet the Government and petitioners readily concede that §1514A is meant to bar two of the enumerated representatives—"officer[s]" and "employee[s]"—from retaliating against other employees of the public company, as opposed to their own babysitters and housekeepers. See Brief for United States as *Amicus Curiae* 16 (§1514A "impose[s] personal liability on corporate officers and employees who

are involved in retaliation against other employees of their employer"); Brief for Petitioners 12 (similar). The Department of Labor's Administrative Review Board (ARB) agrees. *Spinner* v. *David Landau & Assoc., LLC*, No. 10–111 etc., ALJ No. 2010–SOX–029, p. 8 (May 31, 2012). And if §1514A prohibits an "officer" or "employee" of a public company from retaliating against only the public company's own employees, then as the majority points out, the same should be true "grammatically" of contractors, subcontractors, and agents as well, *ante,* at 15.[2]

The majority responds by suggesting that the narrower interpretation could have been clearer if Congress had added the phrase "'of a public company' after 'an employee.'" *Ante*, at 9–10. Fair enough. But Congress could more clearly have dictated the majority's construction of the statute, too: It could have specified that public companies and their officers, employees, contractors, subcontractors, and agents may not retaliate against "their own employees." In any case, that Congress could have spoken with greater specificity in both directions only underscores that the words Congress actually chose are ambiguous. To resolve this ambiguity, we must rely on other markers of intent.

## B

We have long held that where the text is ambiguous, a statute's titles can offer "a useful aid in resolving [the]

—————

[2] In reaching the opposite conclusion, the majority rejects the concessions by the Government and petitioners and gives no weight to the ARB's interpretation. If §1514A creates a cause of action for contractor employees, the majority concludes, so too must it create a cause of action for "housekeepers" and "gardeners" against their individual employers if they happen to work for a public company. *Ante*, at 15. In reaching this result, however, the majority only adds to the absurdities produced by its holding. See *infra*, at 12–13.

ambiguity." *FTC* v. *Mandel Brothers, Inc.*, 359 U. S. 385, 388–389 (1959). Here, two headings strongly suggest that Congress intended §1514A to apply only to employees of public companies. First, the title of §806—the section of the Sarbanes-Oxley Act that enacted §1514A—speaks clearly to the scope of employees protected by the provision: "Protection for Employees of Publicly Traded Companies Who Provide Evidence of Fraud." 116 Stat. 802. Second, the heading of §1514A(a) reinforces that the provision provides "[w]histleblower protection for employees of publicly traded companies."

The majority suggests that in covering "employees of publicly traded companies," the headings may be imprecise. *Ante,* at 16. Section 1514A(a) technically applies to the employees of two types of companies: those "with a class of securities registered under section 12 of the Securities Exchange Act of 1934," and those that are "required to file reports under section 15(d) of the" same Act. Both types of companies are "public" in that they are publicly owned. See *ante,* at 7–8. The difference is that shares of the §12 companies are listed and traded on a national securities exchange; §15(d) companies, by contrast, exchange their securities directly with the public. The headings may therefore be inexact in the sense that the phrase "publicly traded" is commonly associated with companies whose securities are traded on national exchanges. Congress, however, had good reason to use the phrase to refer to §15(d) companies as well: Section 15(d) companies are traded publicly, too. For instance, as the majority recognizes, *ante,* at 20, a mutual fund is one paradigmatic example of a §15(d) company. And mutual funds, like other §15(d) companies, are both publicly owned and widely traded; the trades just take place typically between the fund and its investors directly.

In any case, even if referring to employees of §12 and §15(d) companies together as "employees of publicly traded

companies" may be slightly imprecise, the majority's competing interpretation of §1514A would stretch the statute's headings far past the point of recognition. As the majority understands the law, Congress used the term "employees of publicly traded companies" as shorthand not just for (1) employees of §12 and §15(d) companies, but also for (2) household employees of any individual who works for a §12 or §15(d) company; (3) employees of any private company that contracts with a §12 or §15(d) company; (4) employees of any private company that, even if it does not contract with a public company, subcontracts with a private company that does; and (5) employees of any agent of a §12 or §15(d) company. If Congress had wanted to enact such a far-reaching provision, it would have called it something other than "[w]histleblower protection for employees of publicly traded companies."

Recognizing that Congress chose headings that are inconsistent with its interpretation, the majority notes that the Court has "placed less weight on captions." *Ante*, at 16. But where the captions favor one interpretation so decisively, their significance should not be dismissed so quickly. As we have explained, headings are important "'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres* v. *United States*, 523 U. S. 224, 234 (1998).

## C

### 1

Statutory context confirms that Congress intended §1514A to apply only to employees of public companies. To start, the Sarbanes-Oxley Act as a whole evinces a clear focus on public companies. Congress stated in the Act's preamble that its objective was to "protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws," 116 Stat. 745, disclosures that public companies alone must

file. The Act thus created enhanced disclosure obligations for public companies, §401; added new conflict of interest rules for their executives, §402; increased the responsibilities of their audit committees, §301; and created new rules governing insider trading by their executives and directors, §306. The common denominator among all of these provisions is their singular focus on the activities of public companies.

When Congress wanted to depart from the Act's public company focus to regulate private firms and their employees, it spoke clearly. For example, §307 of the Act ordered the Securities and Exchange Commission (SEC) to issue rules "setting forth minimum standards of professional conduct for attorneys appearing and practicing before the [SEC]," including a rule requiring outside counsel to report violations of the securities laws to public company officers and directors. 15 U. S. C. §7245. Similarly, Title I of the Act created the Public Company Accounting Oversight Board (PCAOB) and vested it with the authority to register, regulate, investigate, and discipline privately held outside accounting firms and their employees. §§7211–7215. And Title V required the SEC to adopt rules governing outside securities analysts when they make public recommendations regarding securities. §78o–6.

Section 1514A, by contrast, does not unambiguously cover the employees of private businesses that contract with public companies or the employees of individuals who work for public companies. Far from it, for the reasons noted above. Yet as the rest of the Sarbanes-Oxley Act demonstrates, if Congress had really wanted §1514A to impose liability upon broad swaths of the private sector, it would have said so more clearly.

Congress' intent to adopt the narrower understanding of §1514A is also clear when the statute is compared to the whistleblower provision that served as its model. That provision, enacted as part of the Wendell H. Ford Aviation

Investment and Reform Act for the 21st Century, 49 U. S. C. §42121, provides that "[n]o air carrier or contractor or subcontractor of an air carrier" may retaliate against an employee who reports a potential airline safety violation.

Section 42121 protects employees of contractors. But as the majority acknowledges, "Congress strayed" from §42121 in significant ways when it wrote §1514A. *Ante*, at 29. First, §42121 specifically defines the term "contractor," limiting the term to "a company that performs safety-sensitive functions by contract for an air carrier." §42121(e). That is in notable distinction to §1514A, which does not define the word "contractor" as a particular type of company, instead placing the term in a list alongside individual "officer[s]" and "employee[s]" who act on a company's behalf. Second, unlike §42121, §1514A sets off the term "contractor" in a separate clause that is subsidiary to the primary subject of the provision—the public company itself. Third, the title of §42121 is "[p]rotection of employees providing air safety information," a title that comfortably encompasses the employees of contractors. Not so of §1514A's headings, as explained above. In short, §42121 shows that Congress had an easy-to-follow model if it wanted to protect the employees of contractors, yet chose to depart from that model in several important ways. We should not presume that choice to be accidental. See *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 734 (1975).

### 2

The majority relies on statutory context as well, but its examples are unconvincing. It first argues that the types of conduct prohibited by the statute—"discharge, demotion, suspension, threats, harassment, [and] discrimination in the terms and conditions of employment"—are "commonly actions an employer takes against its *own*

employees." *Ante,* at 10. The problem is that §1514A does not forbid retaliation by an "employer"; it forbids retaliation by a "[public] company . . . or any officer, employee, contractor, subcontractor, or agent of such company." For the reasons already discussed, Congress could have reasonably included the five types of representatives not in their capacity as employers, but rather as representatives of the company who are barred from retaliating against a public company's employees on the company's behalf.

The majority next suggests that contractors are rarely "positioned to take adverse actions against employees of the public company with whom they contract." *Ante,* at 10. That misconceives the nature of modern work forces, which increasingly comprise a mix of contractors and persons laboring under more typical employment relationships. For example, public companies often hire "independent contractors," of whom there are more than 10 million,[3] and contract workers,[4] of whom there are more than 11 million.[5] And they employ outside lawyers, accountants, and auditors as well. While not every person who works for a public company in these nonemployee capacities may be positioned to threaten or harass em-

———————

[3] Dept. of Labor, Bureau of Labor Statistics, News, Contingent and Alternative Employment Arrangements, Feb. 2005, (July 27, 2005), online at http://www.bls.gov/news.release/conemp.nr0.htm (all Internet materials as visited on Feb. 28, 2014, and available in Clerk of Court's case file).

[4] The Bureau of Labor Statistics distinguishes contract workers from independent contractors, defining the former as "[w]orkers who are employed by a company that provides them or their services to others under contract and who . . . usually work at the customer's worksite." *Id.,* at 2 (Table A).

[5] Penn, Staffing Firms Added Nearly 1 Million Jobs Over Four Years Since Recession, ASA Says, Bloomberg Law (Oct. 8, 2012), online at http://about.bloomberglaw.com/law-reports/staffing-firms-added-nearly-1-million-jobs-over-four-years-since-recession-asa-says/.

ployees of the public company, many are.  See, *e.g., Tides*
v. *The Boeing Co.*, 644 F. 3d 809, 811 (CA9 2011) (noting
that "approximately seventy contract auditors from [an]
accounting firm" possessed "managerial authority" over
the 10 Boeing employees in the company's audit division).
Congress therefore had as much reason to shield a public
company's employees from retaliation by the company's
contractors as it had to bar retaliation by officers and
employees.  Otherwise, the statute would have had a
gaping hole—a public company could evade §1514A simply
by hiring a contractor to engage in the very retaliatory
acts that an officer or employee could not.[6]

  The majority also too quickly dismisses the prominence
of "outplacement" firms, or consultants that help compa-
nies determine whom to fire.  See *ante,* at 11.  Companies
spent $3.6 billion on these services in 2009 alone.[7]  Con-

——————

  [6]The majority submits that the hole might not be so problematic
because §1514A "surely" prohibits a "public company from directing
someone else to engage in retaliatory conduct against the public com-
pany's employees."  *Ante,* at 13.  It surely does, but that is the point—
the whole reason §1514A(a) clearly does so is because it expressly
forbids a public company to retaliate against its employees through
"any officer, employee, contractor, subcontractor, or agent."  The prohi-
bition on retaliation through a contractor would be far less certain
(hence the hole) if Congress had merely forbidden a public company to
retaliate through its "officers and employees."  Moreover, while the
majority concedes that, under the narrower reading of §1514A, Con-
gress' inclusion of the term "contractor" imposes secondary liability in
the event a public company is judgment proof, *ante,* at 13, the majority
fails to recognize that Congress' use of the term also imposes primary
liability against contractors who threaten public company employees
without direction from the company.  Thus, for example, FMR's inter-
pretation of §1514A would prevent an outside accountant from threat-
ening or harassing a public company employee who discovers that the
accountant is defrauding the public company and who seeks to blow the
whistle on that fraud.
  [7]Rogers, Do Firing Consultants Really Exist, Slate, Jan. 7, 2010,
www.slate.com / articles / news_and_politics / explainer/2010/01/getting_

gress surely could have meant to protect public company employees against retaliation at the hands of such firms, especially in the event that the public company itself goes bankrupt (as companies engaged in fraud often do). See, *e.g., Kalkunte* v. *DVI Financial Servs., Inc.*, No. 05–139 etc., ALJ No. 2004–SOX–056 (Feb. 27, 2009) (former employee of bankrupt public company permitted to bring §1514A action against corporate restructuring firm that terminated her employment).[8]

The majority points next to the remedies afforded by §1514A(c), which authorizes "all relief necessary to make the employee whole," in addition to "reinstatement," "back pay," and "special damages . . . including litigation costs, expert witness fees, and reasonable attorney fees." The majority posits that Congress could not have intended to bar contractors from retaliating against public company employees because one of the remedies (reinstatement) would likely be outside of the contractor's power. *Ante,* at 13. But there is no requirement that a statute must make every type of remedy available against every type of defendant. A contractor can compensate a whistleblower with backpay, costs, and fees, and that is more than

—————

the_ax_from_george_clooney.html.

 [8]The majority suggests that an outplacement firm would likely be acting as an "agent" for the public company, such that Congress' additional inclusion of the word "contractor" would be superfluous under the narrower reading of §1514A. *Ante,* at 11, n. 9. The two words are not legally synonymous, however. An outplacement firm and public company might, for example, enter into a contract with a provision expressly disclaiming an agency relationship. Moreover, Congress' use of the term "contractor" would in all events have an independent and important effect: If Congress had not included the term, no one could be held liable if a contractor were to threaten or harass a public company employee without the company's direction. While the majority may speculate that such occurrences are rare, *ibid.*, it is hardly unthinkable. See n. 6, *supra.*

enough for the statute's remedial scheme to make sense. The majority's reference to the affirmative defense for public company "employers" who lack "knowledge" that an employee has participated in a proceeding relating to the fraud report, *ante,* at 12 (citing §1514(A)(a)(2)), fails for a similar reason. There is no rule that Congress may only provide an affirmative defense if it is available to every conceivable defendant.

## D

### 1

Finally, the majority's reading runs afoul of the precept that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 575 (1982). The majority's interpretation transforms §1514A into a sweeping source of litigation that Congress could not have intended. As construed by the majority, the Sarbanes-Oxley Act regulates employment relationships between individuals and their nannies, housekeepers, and caretakers, subjecting individual employers to litigation if their employees claim to have been harassed for providing information regarding any of a host of offenses. If, for example, a nanny is discharged after expressing a concern to his employer that the employer's teenage son may be participating in some Internet fraud, the nanny can bring a §1514A suit. The employer may prevail, of course, if the nanny cannot prove he was fired "because of" the fraud report. §1514A. But there is little reason to think Congress intended to sweep such disputes into federal court.

Nor is it plausible that Congress intended the Act to impose costly litigation burdens on any private business that happens to have an ongoing contract with a public company. As the majority acknowledges, the purpose of

the Act was to protect public company investors and the financial markets. Yet the majority might well embroil federal agencies and courts in the resolution of mundane labor disputes that have nothing to do with such concerns. For instance, a construction worker could file a §1514A suit against her employer (that has a long-term contract with a public company) if the worker is demoted after reporting that another client has mailed the company a false invoice.[9]

The majority's interpretation also produces truly odd distinctions. Under the rule it announces, a babysitter can bring a §1514A retaliation suit against his employer if his employer is a checkout clerk for the local PetSmart (a public company), but not if she is a checkout clerk for the local Petco (a private company). Likewise, the day laborer who works for a construction business can avail himself of §1514A if her company has been hired to help remodel the local Dick's Sporting Goods store (a public company), but not if it is remodeling a nearby Sports Authority (a private company).

In light of the reasonable alternative reading of §1514A, there is no reason to accept these absurd results. The majority begs to differ, arguing that "[t]here is scant evidence" that lawsuits have been brought by the multitude of newly covered employees "'who have no exposure to investor-related activities and thus could not possibly

---

[9] Recognizing that the majority's reading would lead to a "notably expansive scope untethered to the purpose of the statute," the District Court in this case sought to impose an extratextual limiting principle under which an employee who reports fraud is entitled to protection only if her report "relat[es] to fraud against shareholders." 724 F. Supp. 2d 141, 160 (Mass. 2010). The District Court acknowledged, however, that "the language of the statute itself does not plainly provide such a limiting principle," *id.,* at 158, and the majority does not attempt to revive that limitation here.

assist in detecting investor fraud.'" *Ante,* at 22. Until today, however, no court has deemed §1514A applicable to household employees of individuals who work for public companies; even the Department of Labor's ARB rejected that view. *Spinner*, ALJ No. 2010–SOX–029, at 8. And as the District Court noted, prior to the ARB's 2012 decision in *Spinner*, the ARB "ha[d] yet to provide . . . definitive clarification" on the question whether §1514A extends to the employees of a public company's private contractors. 724 F. Supp. 2d 141, 155 (Mass. 2010). So the fact that individuals and private businesses have yet to suffer burdensome litigation offers little assurance that the majority's capacious reading of §1514A will produce no untoward effects.

Finally, it must be noted that §1514A protects the reporting of a variety of frauds—not only securities fraud, but also mail, wire, and bank fraud. By interpreting a statute that already protects an expansive class of conduct also to cover a large class of employees, today's opinion threatens to subject private companies to a costly new front of employment litigation. Congress almost certainly did not intend the statute to have that reach.

2

The majority argues that the broader reading of §1514A is necessary because a small number of the millions of individuals and private companies affected by its ruling have a special role to play in preventing public company fraud. If §1514A does not bar retaliation against employees of contractors, the majority cautions, then law firms and accounting firms will be free to retaliate against their employees when those employees report fraud on the part of their public company clients.

It is undisputed that Congress was aware of the role that outside accountants and lawyers played in the Enron debacle and the importance of encouraging them to play

an active part in preventing future scandals. But it hardly follows that Congress must have meant to apply §1514A to every employee of every public company contractor, sub-contractor, officer, and employee as a result. It is far more likely that Congress saw the unique ethical duties and professional concerns implicated by outside lawyers and accountants as reason to vest regulatory authority in the hands of experts with the power to sanction wrongdoers.

Specifically, rather than imposing §1514A's generic approach on outside accounting firms, Congress established the PCAOB, which regulates "every detail" of an accounting firm's practice, including "supervision of audit work," "internal inspection procedures," "professional ethics rules," and "'such other requirements as the Board may prescribe.'" *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. ___, ___ (2010) (slip op., at 3–4). Importantly, the PCAOB is empowered to levy "severe sanctions in its disciplinary proceedings, up to and including the permanent revocation of a firm's registration . . . and money penalties of $15 million." *Id.,* at ___ (slip op., at 4) (citing 15 U. S. C. §7215(c)(4)). Such sanctions could well provide a more powerful incentive to prevent an accounting firm from retaliating against its employees than §1514A.

The Sarbanes-Oxley Act confers similar regulatory authority upon the SEC with respect to attorneys. The Act requires the SEC to establish rules of professional conduct for attorneys, §307 (codified at 15 U. S. C. §7245), and confers broad power on the SEC to punish attorneys for "improper professional conduct," which would include, for example, a law firm partner's decision to retaliate against an associate who reports fraud. §602 (codified at 15 U. S. C. §78d–3). Indeed, the Act grants the SEC the power to censure culpable attorneys and to deny "permanently" to any such attorney the "privilege of appearing of practicing before" the SEC "in any way." §602.

Congress thus evidently made the judgment that decisions concerning how best to punish law firms and accounting firms ought to be handled not by the Department of Labor, but by the SEC and the PCAOB. Such judgment should not be disturbed under usual circumstances, much less at the cost to congressional intent produced by today's ruling. The majority does offer cogent policy arguments for why Congress might have been wiser to include certain types of contractors within §1514A, noting for example that a law firm or accounting firm might be able to retaliate against its employees for making reports required under the Sarbanes-Oxley Act. *Ante*, at 19. But as the majority recognizes, Congress has since remedied that precise concern, enacting a comprehensive whistleblower incentive and protection program that unequivocally "prohibit[s] any employer"—public or private—"from retaliating against 'a whistleblower' for providing information to the SEC, participating in an SEC proceeding, or making disclosures required or protected under Sarbanes-Oxley and certain other securities laws." *Ante,* at 26 (citing 15 U. S. C. §§78u–6(a)(6), (b)(1), (h)). The majority thus acknowledges that, moving forward, retaliation claims like the petitioners' may "procee[d] under [§78u-6]," *ante,* at 26, n. 17. In other words, to the extent the majority worries about a "hole" in FMR's interpretation, *ante*, at 14, Congress has already addressed it.[10]

———————

[10] The majority also contends that its reading is necessary to avoid "insulating the entire mutual fund industry from §1514A." *Ante,* at 20. But that argument is misguided for a reason similar to the majority's concern about lawyers and accountants. As this Court has observed, Congress responded to the "'potential for abuse inherent in the structure of investment companies,'" *Daily Income Fund, Inc.* v. *Fox*, 464 U. S. 523, 536 (1984), by enacting the Investment Company Act of 1940 and the Investment Advisers Act of 1940. 15 U. S. C. §80a–1 *et seq.*; §80b–1 *et seq.* The Advisers Act in particular grants the SEC broad regulatory authority to regulate mutual fund investment advisers.

## II

Because the statute is ambiguous, and because the majority's broad interpretation has also been adopted by the ARB, there remains the question whether the ARB's decision in *Spinner*, ALJ No. 2010–SOX–029, is entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984).[11] Under *United States* v. *Mead Corp.*, 533 U. S. 218, 226–227 (2001), an agency may claim *Chevron* deference "when it appears [1] that Congress delegated authority to the agency generally to make rules carrying the force of law, and [2] that the agency interpretation claiming deference was promulgated in the exercise of that authority." Neither requirement is met here.

First, the agency interpretation for which petitioners claim deference is the position announced by the ARB, the board to which the Secretary of Labor has delegated authority "in review or on appeal" in connection with §1514A proceedings. 75 Fed. Reg. 3924 (2010). According to petitioners, the ARB's rulings are entitled to deference because the "Secretary is responsible for enforcing Section 1514A both through investigation and through formal adjudication." Brief for Petitioners 61. That is right as far as it goes, but even if the Secretary has the power to in

--------

§80b–11. The Act also authorizes fines and imprisonment of up to five years for violations of SEC rules. The SEC thus has broad discretion to punish retaliatory actions taken by mutual fund advisers against their employees. And to the extent these provisions may have been insufficient to protect mutual fund adviser employees, §78u–6's extensive whistleblower incentive and protection program now unambiguously covers such employees.

[11] Although it claims not to reach the issue, *ante*, at 9, n. 6, the majority implicitly declines to defer to a portion of the ARB's ruling as well, rejecting the ARB's ruling that §1514A does not apply to the household employees of public company officers and employees, *ante,* at 15, and n. 11.

vestigate and adjudicate §1514A claims, Congress did not delegate authority to the Secretary to "make rules carrying the force of law," *Mead*, 533 U. S., at 226–227.  Congress instead delegated that power to the SEC: Section 3(a) of the Sarbanes-Oxley Act, codified at 15 U. S. C. §7202(a), provides that the SEC "shall promulgate such rules and regulations, as may be necessary or appropriate in the public interest or for the protection of investors, and in furtherance of this Act."  So if any agency has the authority to resolve ambiguities in §1514A with the force of law, it is the SEC, not the Department of Labor. See *Martin* v. *Occupational Safety and Health Review Comm'n*, 499 U. S. 144, 154 (1991).  The SEC, however, has not issued a regulation applying §1514A whistleblower protection to employees of public company contractors. And while the majority notes that the SEC may share the (incorrect) view that the Department of Labor has interpretive authority regarding §1514A, *ante,* at 9, n. 6, the majority cites nothing to suggest that one agency may transfer authority unambiguously delegated to it by Congress to a different agency simply by signing onto an *amicus* brief.

That Congress did not intend for the Secretary to resolve ambiguities in the law is confirmed by §1514A's mechanism for judicial review.  The statute does not merely permit courts to review the Secretary's final adjudicatory rulings under the Administrative Procedure Act's deferential standard.  It instead allows a claimant to bring an action in a federal district court, and allows district courts to adjudicate such actions *de novo*, in any case where the Secretary has not issued a final decision within 180 days. That is a conspicuously short amount of time in light of the three-tiered process of agency review of §1514A claims.  See *ante,* at 5–6.  As a result, even if Congress had not delegated to the SEC the authority to resolve ambiguities in §1514A, the muscular scheme of judicial review

suggests that Congress would have wanted federal courts, and not the Secretary of Labor, to have that power. See *Mead*, 533 U. S., at 232 (declining to defer to Customs Service classifications where, among other things, the statute authorized "independent review of Customs classifications by the [Court of International Trade]").

As to the second *Mead* requirement, even if Congress had delegated authority to the Secretary to make "rules carrying the force of law," the "agency interpretation claiming deference" in this case was not "promulgated in the exercise of that authority." *Id.,* at 226–227. That is because the Secretary has explicitly vested any policymaking authority he may have with respect to §1514A in the Occupational Safety and Health Administration (OSHA) instead of the ARB. See 67 Fed. Reg. 65008 (2002). In fact, the Secretary has expressly withdrawn from the ARB any power to deviate from the rules OSHA issues on the Department of Labor's behalf. 75 Fed. Reg. 3925 ("The [ARB] shall not have jurisdiction to pass on the validity of any portion of the Code of Federal Regulations that has been duly promulgated by the Department of Labor and shall observe the provisions thereof, where pertinent, in its decisions").

OSHA has promulgated regulations supporting the majority's reading of §1514A. See 29 CFR §1980.101(f)–(g) (2013). The Secretary, however, has expressly disclaimed any claim of deference to them. See Brief for United States as *Amicus Curiae* 33, n. 8. As a result, the ARB's understanding of §1514A's coverage in *Spinner* was not an "exercise of [the Secretary's] authority" to make rules carrying the force of law, *Mead*, 533 U. S., at 226–227, but rather the ARB's necessary compliance with a regulation that no one claims is deserving of deference in the first place. See *Spinner*, ALJ No. 2010–SOX–029, at 10 (recognizing that "the ARB is bound by the [Department of Labor] regulations").

In the absence of *Chevron* deference, the ARB's decision in *Spinner* may claim only "respect according to its persuasiveness" under *Skidmore* v. *Swift & Co.*, 323 U. S. 134 (1944). See *Mead*, 533 U. S., at 221. But the ARB's decision is unpersuasive, for the many reasons already discussed.

\* \* \*

The Court's interpretation of §1514A undeniably serves a laudatory purpose. By covering employees of every officer, employee, and contractor of every public company, the majority's interpretation extends §1514A's protections to the outside lawyers and accountants who could have helped prevent the Enron fraud.

But that is not the statute Congress wrote. Congress envisioned a system in which public company employees would be covered by §1514A, and in which outside lawyers, investment advisers, and accountants would be regulated by the SEC and PCAOB. Congress did not envision a system in which employees of other private businesses—such as cleaning and construction company workers who have little interaction with investor-related activities and who are thus ill suited to assist in detecting fraud against shareholders—would fall within §1514A. Nor, needless to say, did it envision §1514A applying to the household employees of millions of individuals who happen to work for public companies—housekeepers, gardeners, and babysitters who are also poorly positioned to prevent fraud against public company investors. And to the extent §1514A may have been underinclusive as first drafted, Congress has shown itself capable of filling in any gaps. See, *e.g.,* Dodd-Frank Wall Street Reform and Consumer Protection Act, §§922, 929A, 124 Stat. 1848, 1852 (extending §1514A to credit rating agencies and public company subsidiaries); §922, *id.,* at 1841–1848 (codifying additional whistleblower incentive and protection program

at 15 U. S. C. §78u–6).

The Court's decision upsets the balance struck by Congress. Fortunately, just as Congress has added further protections to the system it originally designed when necessary, so too may Congress now respond to limit the far-reaching implications of the Court's interpretation.[12] But because that interpretation relies on a debatable view of §1514A's text, is inconsistent with the statute's titles and its context, and leads to absurd results that Congress did not intend, I respectfully dissent.

---

[12] Congress could, for example, limit §1514A to contractor employees in only those professions that can assist in detecting fraud on public company shareholders, or it could restrict the fraud reports that trigger whistleblower protection to those that implicate the interests of public company investors, see n. 9, *supra*.