GRIFFITH, Circuit Judge, concurring in the judgment:[1] I agree that the challenged features of the CFPB do not violate the Constitution, but for different reasons than the majority. My colleagues debate whether the agency*s Single-Director structure impermissi-bly interferes with the President’s ability to supervise the Executive Branch. But to make sense of that inquiry, we must first answer a more fundamental question: How difficult is it for the President to remove the Director? The President may remove the CFPB Director for “inefficiency, neglect of duty, or malfeasance in office.” After reviewing these removal grounds, I conclude they provide only a minimal restriction on the President’s removal power, even permitting him to remove the Director for ineffective policy choices. Therefore, I agree that the CFPB’s structure does not impermissibly interfere with the President’s ability to perform his constitutional duties. I Although most principal officers of Executive Branch agencies serve at the pleasure of the President as at-will employees, in Humphrey’s Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), the Supreme Court held that Congress may protect some principal officers by specifying the grounds upon which the President may remove them from office. The Court permitted Congress to establish these for-cause removal protections for officers who carry out “quasi judicial” and “quasi legislative” tasks, but not those who perform “purely executive” functions. Id. at 629-32, 55 S.Ct. 869. Some fifty years later in Morrison v. Olson, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), the Supreme Court recast the inquiry established in Humphrey’s Executor. The Court’s evaluation of the “functions” performed by an officer did not “define rigid categories” but only sought to “ensure that Congress does not interfere with the President’s exercise of the ‘executive power’ and his constitutionally appointed duty to ‘take care that the laws be faithfully executed’ under Article II.” Id. at 689-90, 108 S.Ct. 2597 (quoting U.S. Const, art. II, §§ 1, 3). According to the Morrison Court, “the real question is whether the removal restrictions are of such a nature that they impede the President’s ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light.” Id. at 691, 108 S.Ct. 2597; see also id. at 692, 108 S.Ct. 2597 (asking whether a restriction “impermissibly burdens” or “interfere[s] impermissibly” with the President’s constitutional obligations). More recently, in Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010), the Supreme Court applied Morrison’s test to strike down a particularly restrictive removal scheme, holding that “multilevel protection from removal .... contravenes the President’s ‘constitutional obligation to ensure the faithful execution of the laws.’ ” Id. at 484, 130 S.Ct. 3138 (quoting Morrison, 487 U.S. at 693, 108 S.Ct. 2597).[2] In this case, my colleagues conduct the Morrison inquiry by debating how the CFPB’s novel institutional design affects the President’s supervision of the agency. They focus on the agency’s single-Director structure and consider whether a single agency head is more or less responsive to the President than a multimember commission. And they debate whether, because of the single Director’s five-year term, a one-term President has sufficient supervisory power over the CFPB. Although these difficult questions may matter in a future case, we cannot understand their constitutional significance in this case until we know the strength of the Director’s removal protection. For-cause removal protections are generally considered the defining feature of independent agencies. See Free Enterprise Fund, 561 U.S. at 483, 130 S.Ct. 3138.[3] But not all removal protections are created equal. See id. at 502-08, 130 S.Ct. 3138 (emphasizing that the “unusually high” removal standard that protected the Board members in that case “presented] an even more serious threat to executive control”). Here, the President .may remove the CFPB Director for “inefficiency, neglect of duty, or malfeasance in office.” 12 U.S.C. § 5491(c)(3). Until we know what these causes for removal mean and how difficult they are to satisfy, we cannot determine whether the CFPB’s novel structural features unconstitutionally impede the President in his faithful execution of the laws. Indeed, the only reason we are debating the constitutionality of the CFPB in the first place is because the Director enjoys removal protection. That’s why the three-judge panel’s initial remedy simply eliminated the Director’s removal protection, thereby ameliorating the panel’s constitu-. tional concerns with the CFPB’s structure. But if it is the Director’s removal protection that prompts our examination of the CFPB’s constitutionality, we must necessarily ask: How much does this removal protection actually constrain the President? If the Director is only marginally more difficult to rémove than an at-will officer, then it is hard to imagine how the Single-Director structure of the CFPB could impermissibly interfere with the President’s supervision of the Executive Branch.[4] Moreover, when addressing the constitutionality of independent agencies, the Supreme Court has directed us to focus on the President’s removal power instead of squinting at “bureaucratic minutiae” such as the structural intricacies debated by the parties here. Free Enterprise Fund, 561 U.S. at 499-500, 130 S.Ct. 3138. In Free Enterprise Fund, the Court chided the dissent for “dismiss[ing] the importance of removal as a tool of supervision” and instead focusing on political and institutional design features. Id. Rather than relying on those features, the Court decided the case on the basis of the removal power, noting that the power to appoint and remove is “perhaps the key mean's” for the President to protect the constitutional prerogatives of the Executive Branch. Id. at 501, 130 S.Ct. 3138; see also Morrison,- 487 U.S. at 695-96, 108 S.Ct. 2597 (noting that the Ethics in Government Act gave the President “several means of supervising or controlling” the independent counsel—“[mjost importantly ... the power to remove the counsel for good cause” (emphasis added) (internal quotation marks omitted)); cf. Bowsher v. Synar, 478 U.S. 714, 727, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (observing that the broad statutory removal provision allowing Congress to remove the Comptroller General was the “critical factor” in determining that Congress controlled the official). A faithful application of Morrison requires us to determine the extent to which-the CFPB’s removal standard actually prevents the President from removing the Director. In addition, this approach allows us to forgo, at least for now, the more vexing constitutional questions about institutional design. Cf. Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 787, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (explaining that “statutes should be construed so as to avoid difficult constitutional questions” (emphasis added)); John F. Manning, The Independent- Counsel Statute: Reading “Good Cause” in Light of Article II, 83 Minn. L. Rev. 1285, 1288 (1999) (arguing that, to avoid a “serious constitutional question,” the “good cause” removal provision in the Ethics in Government Act should be interpreted to allow removal for insubordination). II The Dodd-Frank Wall Street' Reform and Consumer Protection Act provides that' the President may remove the CFPB Director for “inefficiency, neglect of duty, or malfeasance in office.” Pub. L. No. 111-203, § 1011, 124 Stat. 1376, 1964 (2010) (codified at 12 U.S.C. § 5491(c)(3)). For purposes of simplicity, I refer to this as the “INM standard.” Congress first used the INM standard in the late nineteenth century, see An Act To Regulate Commerce, ch. 104, § 11, 24 Statv 379, 383 (1887), and it has since become a có'mmoñ for-cause removal provision for independent agencies, see e.g., An Act To Complete the Codification of Title 46, Pub. L. No. 109-304, § 301(b)(3), 120 Stat. 1485, 1488 (2006); ICC Termination Act of 1995, Pub. L. No. 104-88, § 701(a)(3), 109 Stat. 803, 933; Federal Mine Safety and Health Act of 1977, Pub.' L. No. 95-164,' § 113, 91 Stat. 129Ó, 1313; Federal Aviation Act of 1958, Pub. L. No. 85-726, § 201(a)(2), 72 Stat. 731, 741; Bituminous Coal Act of 1937, ch. 127, § 2(a),-50 Stat. 72, 73; An Act To Create the Federal Trade Commission, ch. 311, § 1, 38 Stat. 717, 718 (1914); see also Marshall J. Breger <& Gary J. Edles, Established by Practice: The Theory and Operation of Independent Federal Agencies, 52 Admin. L. Rev. 1111, 1144-45 (2000)- (describing the INM standard as the prototypical removal provision). In spite of the repeated use of the INM standard.throughout the U.S. Code and its prominent role in Humphrey’s Executor, the meaning of 'the standard’s three grounds for removal remains largely unexamined. Congress has nowhere defined these grounds and the Supreme Court has provided little guidance about the conditions under which they permit removal. See Lessig & Sunstein, supra note 4, at 110-12. Some suggest that the Court in Humphrey’s Executor established that the INM standard prohibits the President from removing an agency officer for disagreements over policy. See, e.g., Concurring Op. at 123 (Wilkins, J.) (arguing that “mere policy disagreements” cannot satisfy the INM standard).[5] After all, the. Court noted in Humphrey’s Executor that President Roosevelt had mentioned to Humphrey their disagreement over the “policies” and “administering of the Federal Trade Commission.” 295 U.S. at 619, 55 S.Ct. 869 (internal quotation marks omitted). However, Humphrey’s Executor established only that the President’s removal power- is not “illimitable” and that the INM standard in the Federal Trade Commission Act is a permissible limitation. Id. at 629, 55 S.Ct. 869. The Court nowhere addressed the extent to which the INM standard insulated Humphrey. When the Court determined that President Roosevelt failed to comply with the INM standard, it was not because he removed Humphrey for any specific policy the Commissioner had pursued. Instead, the President failed to comply with the INM standard because he expressly chose to remove Humphrey for no cause at all. See id. at 612, 55 S.Ct. 869; Bowsher, 478 U.S. at 729 n.8, 106 S.Ct. 3181 (noting that in Humphrey’s Executor “the President did not assert that he had removed the Federal Trade Commissioner in compliance with one of the enumerated statutory causes for removal”). Humphrey’s Executor came to the Supreme Court as a certified question from the Court of Claims. The certificate stipulated as an undisputed fact that the President never removed Humphrey pursuant to the INM standard.[6] And if this admission were not enough, one need look no further than President Roosevelt’s own words to see that he never purported to remove Humphrey under the INM standard. In his first letter to Humphrey, Roosevelt expressly disavowed any attempt to remove the Commissioner for cause: “Without any reflection at all upon you personally, or upon the service you have rendered in your present capacity, I find it necessary to ask for your resignation as a member of the Federal Trade Commission.” Certificate from Court of Claims at 4, Humphrey’s Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (No. 667). After several more exchanges, the President wrote Humphrey saying: “I still hope that you will be willing to let me have your resignation. ... I feel that, for your sake and for mine, it would be much better if you could see this point of view and let me have your resignation on any ground you may care to place it.” Id. at 6 (emphasis added). After Humphrey continued to resist, Roosevelt had had enough and simply asserted: “Effective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission.” Id. at 8.[7] Moreover, even if Humphrey’s Executor could be read to address the extent to which the INM standard insulates an officer, it would offer little guidance. We would first need to assume that President Roosevelt’s general reference to the “policies” and “administering” of the FTC functioned as a ground for removal under one or more of the INM terms (though it is unclear which). And even then, the Court’s ruling tells us only that Roosevelt’s removal of Humphrey based on their ideological differences does not satisfy any of the three INM grounds. Abstract policy differences are not enough.[8] But that does not mean an officer’s policy choices can never satisfy the INM standard. Nor would such a categorical rule make much sense. Certainly some policy disagreements may justify removal under the INM standard. Judge Wilkins even acknowledges as much. See Concurring Op. at 121 (Wilkins, J.) (“[T]he promulgation of a rule contrary to consensus expert advice without sufficient grounds or explanation would subject the Director to risk of removal for inefficiency.”). All told, nothing in the facts, constitutional holding, or logic of Humphrey’s Executor protects an officer from removal if he pursues a particular policy that the President determines to be inefficient, neglectful, or malfeasant. The Supreme Court’s most substantive discussion of the INM terms came in Bowsher v. Synar. There, the Court declared unconstitutional Congress’s delegation of executive power to the Comptroller General, who was an official in the Legislative Branch. 478 U.S. at 728-34, 106 S.Ct. 3181. By joint resolution, Congress could remove the Comptroller General for several statutorily specified causes including the three INM grounds. Id. at 728, 106 S.Ct. 3181. In assessing Congress’s control over the Comptroller General, the Court emphasized that the INM terms are “very broad and, as interpreted by Congress, could sustain removal of a Comptroller General for any number of actual or perceived transgressions of the legislative will.” Id. at 729, 106 S.Ct. 3181 (emphasis added). In other words, the Court determined that the INM removal grounds were so broad that Congress retained significant power to supervise and direct the Comptroller General. However, the Court did not proceed to explore the meaning of the individual grounds for removal because that was unnecessary to resolve the case. See id. at 730,106 S.Ct. 3181. In sum, although Congress has provided little guidancé on the meaning of the INM standard, the Supreme Court in Bowsher nevertheless ' recognized the general breadth of the INM terms. Picking up where Bowsher left off, we must how determine the meaning of the INM standard as we would any other statutory text and interpret it according to the traditional tools of construction. Ill I begin with the text' of the INM standard: “The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office.” 12 U.S.C. § 5491(c)(3). Because Congress has not defined these terms, we give them their ordinary meaning. See Taniguchi v. Kan Pac. Saipan, Ltd., 566 (U.S. 560, 566, 132 S.Ct. 1997, 182 L.Ed.2d 903 2012). To discern a term’s ordinary meaning, the Court generally begins with dictionaries. See, e.g., Sandifer v. U.S. Steel Corp., — U.S. —, 134 S.Ct. 870, 876-77, 187 L.Ed.2d 729 (2014); Schindler Elevator Corp. v. U.S. ex rel. Kirk, 563 U.S. 401, 407-08, 131 S.Ct. 1885, 179 L.Ed.2d 825 (2011); MCI Telecomm’ns Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 225-28, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994). Based on the following analysis, I conclude that the ordinary meaning of the INM terms—particularly given the breadth of the “inefficiency” ground—allow the President enough supervisory authority to satisfy Morrison. A Generally, the ordinary meaning of a statutory term is fixed at the time the statute was adopted. See, e.g., Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (“[W]ords will be interpreted as taking their ordinary, contemporary, common meaning.”); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 78 (2012). Were we to strictly follow that approach here, we would seek to determine the ordinary meaning of each INM term in 2010 when the Dodd-Frank Act established the CFPB. But there is good reason to think that 2010 is not the correct time period to fix the ordinary meaning of the INM terms. The INM standard was first úsed by Congress in the Interstate Commerce Act in 1887 and has since been readopted in dozens of statutes spanning over a century. See swpra Part II. “[Wjhen Congress uses the same language in two statutes having similar purposes ... it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.” Smith v. City of Jackson, 544 U.S. 228, 233, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005).[9] Since the INM standard was introduced in the[1] Interstate Commerce Act, and approved by the Supreme Court in Humphrey’s Executor, Congress has deliberately and repeatedly borrowed its precise language. See Steven G. Calabresi & Christopher S. Yoo, The Unitary Executive: Presidential Power from Washington to Bush 287 (2008) (noting “Congress’s interest in imposing removal restrictions revived after Humphrey’s Executor”). Because Congress has regularly adopted the same INM text for the same general -purpose—securing for agency officers at least a modicum of independence from the President—it is appropriate' to attribute a uniform meaning to the INM standard that is consistent with the meaning it bore when it was first adopted. For these reasons, I rely on sources from the late-nineteenth and early twentieth centuries to determine the meaning of the standard. B The INM standard provides three separate grounds for removal. Although the standard may seem to be.a unitary, general “for cause” provision, the' Supreme Court has clarified that these -three grounds carry discrete meanings. In Humphrey’s Executor the Court explained that the INM standard prevented the President from removing any officer except for “one or more of the causes named in the applicable statute.” 295 U.S. at 632. Moreover, Congress has enacted other statutes that include only two of the three INM removal grounds, indicating that each term bears a distinct meaning. For instance, weeks after the Court decided Humphrey’s Executor, Congress added a removal provision to the National Labor Relations Act, but it narrowed. the INM standard by eliminating “inefficiency.” See ch. 372, § 3, 49 Stat. 449, 451 (1935) (codified at 29 U.S.C. § 153). Turning then to each basis for removal, “malfeasance” was defined as “the doing of that which ought not to be done; wrongful, conduct, especially official misconduct; violation of a public trust or obligation; specifically, the doing of an act which is positively unlawful or wrongful, in ■ contradistinction to misfeasance.” 6 The Century Dictionary and Cyclopedia 3593 (Benjamin E. Smith ed., 1911).[10] “Neglect of duty[1]? meant “failure to do ¡something that one is bound to do,”- a definition broadly echoed by. courts and dictionaries alike. See A Law Dictionary 404-05, . 810 (Henry Campbell Black ed., 2d ed. 1910).[11] However, I concentrate on “inefficiency” because it is the broadest of the three INM removal grounds and best illustrates the minimal extent to which the INM standard restricts the President’s ability to supervise the Executive Branch. Dictionaries consistently defined the word “inefficiency” to mean ineffective or failing to produce some desired result. For example, one prominent turn-of-the-century dictionary defined “efficient” as “[a]ct-ing or able to act' with due effect; adequate in performance; bringing to bear the requisite knowledge, skill, and industry; capable; competent.” 8 The Century Dictionary and Cyclopedia, supra, at 1849. The same dictionary also defined “inefficient” to mean “[n]ot efficient; not producing or not capable of producing the desired effect; incapable; incompetent; inadequate.” 5 id. - at 3072. Other dictionaries from the time period reiterated these definitions. See, e.g., 3 A New English Dictionary on Historical Principles 52 (Henry Bradley ed., 1897) (defining “efficient” as “productive of effects; effective; adequately operative. Of persons: Adequately skilled”); 5 id. at 240 (James A.H. Murray ed., 1901) (defining “inefficient” as “[n]ot efficient; failing to produce, or incapable of producing, the desired effect; ineffective. Of a person: Not effecting or accomplishing something; deficient in the ability or industry required for what one has to do; not fully capable”).[12] These dictionaries indicate that an individual acts inefficiently when he fails to produce some desired effect or is otherwise ineffective in performing or accomplishing some task. • This broad understanding of “inefficiency” is supported by other contemporaneous sources, such as the debates in Congress both before and after Humphrey’s Executor. Legislative history is a permissible tool of statutory interpretation when used “for the purpose of establishing linguistic usage” or “showing that a particular word or phrase is capable of bearing a particular meaning.” Scalia & Garner, supra, at 388. The debates in Congress during the early twentieth century display how the “inefficiency” ground for removal was understood by “intelligent and informed people of the time.” Antonin Scalia, Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws, in A Matter of Interpretation 3, 38 (Amy Gutmann ed., 1997). When discussing congressional control of the Comptroller General, who was protected by the INM terms, Members of Congress assumed the Comptroller could be removed for “inefficiency” if he failed to produce Congress’s desired effects. One Congressman maintained that if the Comptroller “was inefficient and was not carrying on the duties of his office as he should and as the Congress expected, [then Congress] could remove him” under the INM standard. 61 Cong. Rec. 1081 (1921) (statement of Rep. Joseph Byrns) (emphases added); see also Bowsher, 478 U.S. at 728, 106 S.Ct. 3181 (inferring from this quotation that “inefficiency” constitutes a broad ground for removal). And another Member reiterated that when the Comptroller General “fails to do that work [of Congress] in a strong and efficient way, in a way the Congress would have the law executed, Congress has its remedy, and it can reach out and say that if the man is not doing his duty, if he is inefficient ... he can be removed.” 61 Cong. Rec. at 1080 (statement of Rep. James Good) (emphases added). Thus, even though the Comptroller General was protected by the INM terms, the breadth of the “inefficiency” ground permitted Congress to remove him for failing to perform his duties in the manner Congress wanted. Three years after Humphrey’s Executor, Congress again considered the meaning of “inefficiency” when debating whether to include INM protections for officials of the Civil Aeronautics Authority. One Senator participating in the debate, fearing that the “inefficiency” cause did not provide sufficient independence for agency officials, even lamented: “If we provide that the President may remove a man for inefficiency, to my mind we give him unlimited power of removal. Under such authority he could have removed Mr. Humphrey, had he assigned that as a reason. ... I do not see anything to be gained by discussing the legal question if we are to leave the word ‘inefficiency’ in the provision.” 83 Cong. Rec. 6866 (1938) (statement of Sen. William Borah). While this sentiment somewhat overstates the breadth of the “inefficiency” ground, it reflects a broader truth exemplified in the Congressional Record: well-informed people in the early twentieth century understood the word “inefficiency” in a manner consistent with its dictionary definition. And for those who find it relevant, turning to the contemporary meaning of “inefficiency” would not change much in this analysis. The word has maintained a fairly stable meaning throughout the life of the INM standard. If anything, the contemporary definition of “inefficiency” has gradually become more expansive than it was at the time of Humphrey’s Executor. While older definitions of inefficiency largely discuss ineffectiveness, modern definitions have increasingly adopted an additional definition of “wasteful.” See, e.g., Efficiency, Oxford English Dictionary (2d ed. 1989) (outlining the etymological evolution of “efficiency”). And this broad understanding of “inefficiency” is further supported by contemporary usage. See, e.g., Budget Hearing—Consumer Financial Protection Bureau Before the Subcomm. on Oversight & Investigations of the H. Comm, on Fin. Servs., 112th Cong. 8 (2012) (statement of Rep. Barney Frank, Ranking Member, H. Comm, on Fin. Servs.) (discussing the INM standard and stating that “this notion that the Director cannot be removed is fanciful. ... No one doubts that if a change in Administration comes, and the new President disagrees with the existing Director, he or she can be removed. And proving that you were not inefficient, the burden of proof being on you, would be- overwhelming” (emphases added)).[13] While ordinary usage reveals 'that an officer is “inefficient” when he fails to produce or accomplish some end, one might wonder who or what sets the end that the officer must efficiently pursue. In context, it is clear that the end cannot be set by the officer himself. After all, it is a removal ground that we are interpreting. Congress establishes the broad purposes of an independent agency, see, e.g., 12 U.S.C. § 5511 (outlining the purpose, objectives, and functions of the CFPB), and the President assesses whether the officer has produced the “desired effect.” Put differently, an officer is inefficient when he fails to produce or accomplish the agency’s ends, as understood or dictated by the President operating within the parameters set by Congress. All told, the President retains significant authority under the INM standard to remove the CFPB Director. The breadth of the standard—particularly the inefficiency ground—preserves in the President sufficient supervisory power to perform his constitutional duties.[14] c The INM standard provides a broad basis for removing the CFPB Director, but what steps must the President take to effect such a removal? It appears well-settled that an officer with removal protection is entitled to notice and some form of a hearing before removal. See Shurtleff v. United States, 189 U.S. 311, 313-14, 23 S.Ct. 535, 47 L.Ed. 828 (1903) (concluding that where removal is sought pursuant to statute for “inefficiency, neglect of duty, or malfeasance in office ... the officer is entitled to notice and a hearing”); Reagan v. United States, 182 U.S. 419, 425, 21 S.Ct. 842, 45 L.Ed. 1162 (1901) (stating that where causes of removal are specified by the Constitution or statute, “notice and hearing are essential”).[15] Although the Supreme Court has not defined the precise contours of this process, there is little reason to think it would impose an onerous burden on the President. See Breger & Edles, supra, at 1147-50, Afterwards, removal would be permissible if the President determined that the CFPB Director had been ineffective or incapable of “producing the desired effect.” Because removing an officer for “inefficiency” is a removal for cause, the President should identify what' the Director did that was. inefficient. In other words, the President should identify the action .taken by the Director that constitutes the cause for which he is being removed. Then the President must simply offer a reasoned, non-pretextual explanation of how those actions were inefficient.[16] In practical effect, my approach yields a result somewhat similar to Judge Kava-naugh’s proposed remedy. He would sever the for-cause provision from the CFPB’s authorizing statute, making the Director removable at will. See Dissenting Op. at 167,198-200 (Kavanaugh, J.). My interpretation of the INM standard would not disturb Congress’s design of the CFPB, but it would allow the President to remove the Director based on policy decisions that amounted to inefficiency. In addition, my analysis of the INM standard would likely have broader implications. For example, the definition of “inefficiency” presented here would presumably apply to other independent agencies protected by the INM standard. See supra Part III.A. And while I conclude here that the INM standard is a permissible restriction on the President’s ability to remove the CFPB Director, oth-er removal standards—particularly those lacking the “inefficiency” ground—may not be defensible under Humphrey’s Executor and Morrison. IV Judge Wilkins argues this interpretation of the INM standard defeats the purpose of the provision. See Concurring Op. at 122-24 (Wilkins, J.). After all, the Court in Humphrey’s Executor examined the legislative history of the Federal Trade Commission Act and concluded that the “congressional'intent” underlying the Act was to create an “independent” body of experts. 295 U.S. at 625, 55 S.Ct. 869. How can agency directors be independent if the President can remove them so easily for “inefficiency”? As a preliminary matter, the Court’s discussion of FTC “independence” in Humphrey’s Executor was part of its statutory holding, not its constitutional analysis. See Maj. Op. at 98-99. In its statutory analysis, the Court merely attempted to discern if the INM standard was intended to limit the President’s removal power, The Court determined that it did, staking its conclusion on the text of the statute: “The words of the act are definite and unambiguous.” 295 U.S. at 623, 55 S.Ct. 869. The Court then proceeded to address the legislative history, but it expressly disavowed any reliance on that discussion, see id. at. 623-25, 55 S.Ct. 869, and concluded that the INM standard was designed to reduce the President’s otherwise “illimitable” removal power. But as described above, the Court never addressed just how much the INM standard limits that power. See supra Part II. More fundamentally^ a straightforward textual analysis of “inefficiency” does not remove the “concept of ‘independence’ from ‘independent agencies,’” Concurring Op. at 123 (Wilkins, J.), because agency independence is not a binary but rather a matter of degree. This principle is at the heart of Morrison, which does not forbid all interference with the President’s executive power but only forbids too much interference. See 487 U.S. at 692. Insisting that each INM term be interpreted to' maximize director independence thwarts Congress’s specific choice of means to protect the Director. “[N]o legislation pursues its purposes at all costs. ... [I]t frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute’s primary objective must be the law.” Rodriguez v. United States, 480 U.S. 522, 525-26 (1987) (per curiam). With the INM standard, Congress chose to provide three discrete grounds for removal, at least one of which is very broad. In other words, Congress specified the amount of removal protection the CFPB Director would receive, and that amount is minimal. Elsewhere Congress has elected to provide greater protection. For example, only weeks after Humphrey’s Executor. Congress chose not to include “inefficiency” as a ground for removal in the National Labor Relations Act. See ch. 372, § 3, 49 Stat. 449,- 451 (1935) (codified at.29 U.S.C. § 153) (permitting removal “upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause”). Since Humphrey’s Executor, Congress has created a wide range of removal protections, some stronger than others. See Free Enterprise Fund, 561 U.S. at 549-56, 130 S.Ct. 3138 (Breyer, J., dissenting) (listing numerous agency removal protections, many of which provide different statutory grounds for removal). “[L]aw is like a vector. It has length as well as direction. We must find both, or we know nothing of value. To find length we must take account of objectives, of means chosen, and of stopping places identified.” Frank H. Easter-brook, The Role of Original Intent in Statutory Construction, 11 Harv. J.L. & Pub. Pol’y 59, 63 (1988). Here, Congress specified that the INM standard would move certain agencies in the direction of greater independence from the President, compared to those officers subject to at-will removal. But Congress also specified just how far that principle of independence would reach, and it is not for us to second-guess that choice. “The removal restrictions set forth in the statute mean what they say.” Free Enterprise Fund, 561 U.S. at 502, 130 S.Ct. 3138. * * * The challenged features of the CFPB do not violate Article II because they do not prevent the President from performing his constitutional duty to supervise the Executive Branch. That is so because the INM standard creates only a minimal barrier to the President removing the CFPB Director. Of course, if Congress desires, it may pass a more restrictive removal provision, as it has with other agencies. At that point, my colleagues’ thorough evaluation of the CFPB’s bureaucratic structure may be necessary. But as it stands today, such an evaluation is neither required nor consistent with the mandate from Morrison. . Although I concur in the majority's reinstatement of the panel’s statutory holding, I concur only in the judgment regarding the constitutional question. . I agree with Judge Kavanaugh’s statements in footnotes 7 and 18 of his dissent: Humphrey’s Executor and Morrison appear at odds with the text and original understanding of Article II. The Framers understood that the President's constitutional obligations entitle him to remove executive officers; the Supreme Court said as much in Free Enterprise Fund. But until the Court addresses this tension, we are bound to faithfully apply Humphrey’s Executor and Morrison to the question before us. . Legal commentators have traditionally agreed that for-cause removal protection is an essential characteristic of independent agencies. In recent years some scholars have argued that other factors—various indicia of independence, political considerations, and agency conventions—must also be considered when assessing agency independence. See generally Rachel E. Barkow, Insulating Agencies: Avoiding Capture Through Institutional Design, 89 Tex. L. Rev. 15 (2010); Lisa Schultz Bressman & Robert B. Thompson, The Future of Agency Independence, 63 Vand. L. Rev. 599 (2010); Kirti Datla & Richard L. Revesz, Deconstructing Independent Agencies (and Executive Agencies), 98 Cornell L. Rev. 769 (2013); Aziz Z. Huq, Removal as a Political Question, 65 .Stan, -L. Rev. 1 (2013); Adrian Vermeule, Conventions of Agency Independence, 113 Colum. L, Rev. 1163 (2013). Yet evén these scholars generally acknowledge that removal protections play an important role for independent agencies. Although the presence of removal protections may not be the last question when assessing agency independence, it is generally the first. . For decades legal scholars have suggested that the Humphrey's Executor standard of'"inefficiency, neglect of duty, or malfeasance in office" provides a low barrier to presidential removal. See, e.g., Lawrence Lessig & Cass R, Sunstein, The President and the Administration, 94 Colum. L. Rev. 1, 110-12 (1994) ("Purely as a textual matter ... ‘inefficiency, neglect of duty, or malfeasance in office’ seem best read to grant the President at least something in the way of supervisory and removal power—dllowing him, for example, to discharge, as inefficient or neglectful of duty, those commissioners who show lack of diligence, ignorance, incompetence, or lack of commitment to their legal duties. The statutory words might even allow discharge of commissioners who have frequently or on important occasions acted in ways inconsistent with the President’s wishes with respect to what is required by sound policy.”); Geoffrey P. Miller, Independent Agencies, 1986 Sup. Ct. Rev. 41, 86-87 (arguing that for-cause provisions like the standard from Humphrey’s Executor can and should be interpreted broadly to permit extensive presidential removal); Richard H. Pildes & Cass R. Sunstein, Reinventing the Regulatory State, 62 U. Chi. L. Rev. 1, 30 (1995) (noting that the .removal standard'from Humphrey’s Executor may permit the President to remove officers for "inefficiency” if "he finds [them] incompetent because of their consistently foolish policy choices”); Lindsay Rogers, The Independent Regulatory Commissions, 52 Pol. Sci, Q. 1, 7-8 (1937) (claiming that "[n]o ‘institutional consequences’ are to be expected from the Humphrey case” because presidents will be able to remove officers with.ease under the Humphrey’s Executor standard); Paul R. Verkuil, The Status of Independent Agencies After Bowsher v. Synar, 1986. Duke LJ. 779, 797 n.100 (noting that the Humphrey’s Exept^tor standard "could be construed so as to encompass a general charge of maladministration, in which event even if the terms of removal are deemed to be exclusive they could still be satisfied by a removal by the President on the ground of policy incompatibility”). . Certificate from Court of Claims at 12, Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (No. 667) ("The decedent [Humphrey] was not removed from his office as aforesaid on account of any inefficiency, neglect of duty, or malfeasance in office.”). And by filing its demurrer, the United States "admitted] the facts stated in the petition to be true.” Id. at 15. . See Peter L. Strauss, The Place of Agencies in Government: Separation of Powers and the Fourth Branch, 84 Colum. L. Rev. 573, 615 (1984) (observing that President Roosevelt "had given Commissioner Humphrey no particular directive; he had asked no advice that Humphrey then refused to give; he did not, perceiving insubordination, direct [Humphrey] to leave” and therefore the Court did not address "whether the President could give the FTC Commissioners binding directives ... or what might be the consequences of any failure of theirs to honor them”). The Supreme Court in Free Enterprise Fund likewise suggested in dicta that Humphrey’s Executor precludes removal based on "simple disagreement” with a principal officer’s "policies and priorities.” 561 U.S. at 502, 130 S.Ct. 3138. In light of the facts of Humphrey’s Executor, the Court's reference to "simple disagreement” over policy refers precisely to the abstract, generalized policy differences Roosevelt arguably invoked when removing Humphrey. See Humphrey's Executor, 295 U.S. at 618-19, 55 S.Ct. 869. . See also Lawson v. FMR LLC, — U.S. —, 134 S.Ct. 1158, 1176, 188 L.Ed.2d 158 (2014) ("[P]arallel text and purposes counsel in favor of interpreting .., provisions consistently.”); Northcross v. Bd. of Educ. of Memphis City Sch., 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (per curiam) (stating that when two provisions of' different statutes share similar language, that is a "strong indication” they are to be interpreted consistently); Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (explaining that "where Congress borrows terms of art” it also borrows their meaning); see also William N. Eskridge Jr., Interpreting Law: A Primer on How To Read Statutes .and the Constitution 123 (2016) (explaining that when "similar or identical terminology is not a coincidence, because the legislature has borrowed it from a previous law,” interpreters should consider maintaining “[c]onsisten-cy across the U.S. Code”); Scalia & Garner, supra, at 323 ("[W]hen a statute uses the very same terminology as an earlier statute ... it is reasonable to believe that the terminology bears a consistent meaning.”). . Contemporary definitions of malfeasance are generally comparable. See, e.g., Malfeasance, Black’s Law Dictionary (10th ed. 2014) (‘‘A wrongful, unlawful, or dishonest act; esp,, wrongdoing or misconduct by a public official.”); see also Daugherty v. Ellis, 142 W.Va. 340, 97 S.E.2d 33, 42-43 (1956) (collecting definitions of “malfeasance”). Courts have likewise interpreted malfeasance to mean corrupt conduct that is wholly wrongful, if not positively unlawful. See, e.g., State ex rel. Neal v. State Civil Serv. Comm’n, 147 Ohio St. 430, 72 N.E,2d 69, 71 (1947)'(“Nonfeasance is the omission of an act which a person ought to do; misfeasance is the improper doing of an act which a person might lawfully do; and malfeasance is the doing of an act which a person ought not to do at all.”) (quoting Bell v. Josselyn, 69 Mass. 309, 311 (1855))), Courts have often interpreted “malfeasance in office” to require a wrongful act that was done in an official capacity. See, e.g., Arellano v. Lopez, 81 N.M. 389, 467 P.2d 715, 717-18 (1970). . See also Cavender v. Cavender, 114 U.S. 464, 472-74, 5 S.Ct. 955, 29 L.Ed. 212 (1885) (finding "neglect of duty" when a trustee failed to perform his duty to invest the trust funds he had received); Holmes v. Osborn, 57 Ariz. 522, 115 P.2d 775, 783 (1941) (defining "neglect of duty” as equivalent to "nonfea-sance,'-’ which means the "substantial failure to-perform duty” (quoting State v. Barnett, 60 Okla.Crim. 355, 69 P.2d 77, 87 (1936))). . See also 2 Universal Dictionary of the English Language 1817 (Robert Hunter & Charles Morris eds., 1897) ("Efficient” defined as "[clausing or producing effects or • results; acting as the cause of effects; effective,” and as "[h]aving acquired a competent knowledge of or acquaintance with any art, practicé, or duty; competent; capable”); id. at 2660 ("Inefficient” defined as "wanting the power to produce the desired or proper effect; inefficacious; powerless,” and as "[i]ncapa-ble; wanting in ability or capacity; incompetent," and as "[¡Incapable of or indisposed to effective action”); A Dictionary of the English Language 306 (James Stormonth ed., 1885) ("Efficient” defined as “producing ' effects; able; competent” and "effectual; effective; capable, efficacious”); id. at 491 ("Inefficient” defined as "not possessing the power or qualities desired; not efficacious; not active” and as "want of power or qualities to produce the effects desired; inactivity”); Webster’s International Dictionary of the English Language 472 (Noah Porter ed., 1898) ("Efficient” defined as "[clausing effects; producing results; that makes the effect to be what it is; actively operative; not inactive, slack, or incapable; characterized by energetic and useful activity”); id. at 756 ("Inefficient” defined as "not producing the effect intended or desired; inefficacious” and as "[¡Incapable of, or indisposed to, effective action; habitually slack or remiss; effecting little or nothing; as, inefficient workmen; an inefficient administrator”); Dictionary of the English Language 465 (Joseph E. Worcester ed., 1878) ("Efficient” defined as "[alctually producing or helping to produce effects; that produces directly a certain effect; causing effects; effective; efficacious; effectual; competent; able; active; operative"); id. at 747 ("Inefficient" defined as "[n]ot efficient; having little energy; inactive; ineffectual; ineffi-cacious”). . One commentator has suggested that the contemporary understanding of official "inefficiency” is limited to instances of "pecuniary or temporal waste." Kent H. Barnett, 'Avoiding Independent Agency Armageddon, 87 Notre Dame L. Rev. 1349, 1386 (2012) (citing The New Oxford American Dictionary 867 (2001)). This assertion is unconvincing for at least two reasons. First, the very dictionary on which the commentator relies also defines "inefficient" to include the failure to "achiev[e] maximum productivity" and the failure "to malee the best use of time or resources.” The New Oxford American Dictionary, supra, at 867 (emphases added). These definitions would seemingly allow a finding of "inefficiency" any time the President determined an officer used resources imperfectly, for ’ instance by pursuing an unwise policy, Second, a host of other contemporary dictionaries provide definitions of "inefficiency” that are entirely consistent with the turn-of-the-century usage presefited here. See; e.g., Merriam-Webster's Collegiate Dictionary.(11th ed. 2014) (defining "inefficient” as; "not producing the effect intended or desired ,.. wasteful of time or energy .., incapable, incompetent”); ■Bryan-A. Garner, Gamer's Modern American Usage 293, 462 (2009) (similar); Inefficient, The American Heritage Dictionary of the English Language (2017) (similar), . Judge Wilkins argues that my interpretation of "inefficiency” is overly broad because it permits removal for some policy disagreements. However, he does not address the dictionaries and other contemporaneous sources that support my analysis, nor the Supreme Court’s construal of the INM terms in Bowsher. Instead, Judge Wilkins relies on a line of cases pertaining to the termination of federal employees under the civil-service statutes, which permit termination of government employees "for such -cause as will promote the efficiency of the service.” See Concurring Op, at 122 (Wilkins, J.) (citing 5 U.S.C. § 7513). I am skeptical that this line of cases can explain the meaning' of "inefficiency” in the INM standard. Establishing that a removal will "promote the efficiency of the service" calls for different considerations than establishing that an officer himself has acted inefficiently. Moreover, every single case Judge Wilkins cites upholds the removal of an employee, so none demonstrate what official conduct—including policy choices—would fail to meet the inefficiency standard. And more fundamentally, if these civil-service cases controlled our interpretation of ■ the INM standard, they would actually increase the President’s control of independent agencies. This court hás held that the "efficiency of the service" standard permits removal for insubordination and for abstract policy differences. If this standard were applied to INM-protected officers, it’s unclear how agencies could retain any independence from presidential control. See, e.g., Meehan v. Macy, 392 F.2d 822, 836 (D.C. Cir. 1968) (“There can be no doubt that an em-. ployee may be discharged for failure to obey valid instructions, or that a discharge for insubordination will promote the efficiency of the service.”), reh’g on other grounds, 425 F.2d 469 (D.C, Cir. 1968), aff'd en banc, 425 F.2d 472 (D.C. Cir. 1969); Leonard v. Douglas, 321 F.2d 749, 750-53 (D.C. Cir. 1963) (upholding the removal of a Justice Department attorney whose “professional competence [wa]s not questioned” but whose superi- or found him to be generally "unsuitab[le]’' for a "policy-determining position”). . The Supreme Court’s due-process cases from the 1970s and 1980s also suggest that an officer covered by the INM standard would be constitutionally entitled to some procedural protections before removal. See, e.g., Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (ruling that persons classified as civil servants under state law who could be terminated only for cause possessed a property right in their job security); Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 576-77, 92 S.Ct. 2701, 33 L.Ed.2d. 548 (1972); see also Robert E. Cushman, The Independent Regulatory Commissions 466 (1972). Most agency statutes do not prescribe specific procedures for removal hearings. Breger & Edles, supra, at 1147-51. But if removal protections secure a type of property interest for officers, see, e.g., Roth, 408 U.S. at 576-77, 92 S.Ct. 2701, then the removal procedures would need to satisfy an officer’s procedural due-process rights, see Mathews v. Eldridge, 424 U.S. 319, 332-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This would generally require something less than a formal hearing under the Administrative Procedure Act. See Breger & Edles, supra, at 1147-50. . A future case challenging a President’s decision to actually remove an officer may require courts to articulate the appropriate standard for judicial review, though that question is beyond the scope of this case. See generally Dalton v. Specter, 511 U.S. 462, 474-77, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994); Mountain States Legal Found. v. Bush, 306 F.3d 1132, 1135-36 (D.C. Cir. 2002); Breger & Edles, supra, at 1151; cf. John F, Dillon, Commentaries on the Law of Municipal Corporations § 484, at 815 (1911) ("[Tjhe power of the courts to review the acts of the removing power is necessarily limited." (emphasis omitted)). . The perma.ee links throughout this opinion archive materials that are available online. See Encino Motorcars, LLC v. Navarro, - U.S.-, 136 S.Ct. 2117, 2123, 195 L.Ed.2d 382 (2016) (using perma.cc); Bandimere v. SEC, 844 F.3d 1168, 1170 n.1 (10th Cir. 2016) (same). . See also 78 Cong. Rec. 1679 (1934) (statement of Sen. Simeon Fess) (reviewing President Roosevelt’s letters to Humphrey and noting that the President made no attempt to remove the Commissioner under the INM standard); William E. Leuchtenburg, The Supreme Court Reborn: The Constitutional Revolution in the Age of Roosevelt 60-63 (1996) (recounting a Cabinet meeting in which the President acknowledged that he erred by trying to pressure Humphrey gently instead of removing him for cause under the INM standard). . I do not agree that ”[i]n practical effect,” Judge Griffith’s "approach yields a result somewhat similar to Judge Kavanaugh's proposed remedy.” Concurring Op. at 135 (Griffith, J.). There are substantial differences between the President’s power of removal "for cause” and the President’s power to remove an individual who has no such protection. One of the biggest is that non-“for cause” employees are not entitled due process before being removed from office, see Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), but “for cause” employees are so entitled. Experience under the Civil Service Reform Act of 1978 proves how time-consuming and cumbersome pre-removal due process procedures can be.